## BOSTON ELEVATED RAILWAY COMPANY *vs.* COMMONWEALTH & others.

Suffolk.    May 14, 1940. — January 8, 1942.

Present: FIELD, C.J., DONAHUE, DOLAN, COX, & RONAN, JJ.

*Boston Elevated Railway Company. Street Railway,* Location. *Jurisdiction,* By consent or waiver, Justiciable question, Determination of "just cause" for legislative action. *Constitutional Law,* Separation of powers of government, Public utilities, Public rights and interests, Police power, Obligation of contracts, Due process of law, Waiver of constitutional rights, Separable portions of statute. *Contract,* What constitutes, Validity, Construction, Performance and breach, Waiver, With Commonwealth, Street railway location, Condition subsequent, Operation of Boston Elevated Railway. *Equity Jurisdiction,* Determination of "just cause" for legislative action, Forfeiture of franchise. *Waiver. Way,* Public: street railway location. *Easement. License. Equity Pleading and Practice,* Waiver. *Commonwealth,* Contracts. *Public Officer. Agency,* What constitutes, Scope of authority or employment. *General Court. Words,* "Locations," "Just cause," "Police power," "Property," "Revocation," "Forfeiture."

Jurisdiction of the Supreme Judicial Court to determine, upon a petition in equity by the Boston Elevated Railway Company under § 2 of St. 1939, c. 482, whether there was "just cause for the revocation and declaration of forfeiture provided for in" § 1, was beyond question; such question was justiciable.

The Boston Elevated Railway Company, by its resort to a petition in equity under § 2 of St. 1939, c. 482, for a determination of the question, whether there was "just cause for the revocation and declaration of forfeiture provided for in" § 1, waived all objections to such determination in that proceeding, but was not precluded from attacking the existence of legislative power to declare such a forfeiture and make such a revocation.

The only question presented to this court upon a reservation on the pleadings and a "stipulation of agreed facts" of a proceeding by the Boston Elevated Railway Company under § 2 of St. 1939, c. 482, was whether, on the facts appearing in the record, the revocation and declaration of forfeiture purporting to have been made under § 1 impaired the constitutional rights of the company.

The action of the Legislature in making both the revocation and the declaration of forfeiture in § 1 of St. 1939, c. 482, could not be annulled in a proceeding under § 2 if either was constitutional.

By reason of the provisions of §§ 19, 21, of St. 1897, c. 500, and notwithstanding the provisions of Pub. Sts. c. 105, § 3, the grant to the Boston Elevated Railway Company of the Atlantic Avenue location

became, upon construction within the time specified, a contract binding the Commonwealth not to revoke the location at mere pleasure of the Legislature without payment of compensation; and the making of such a contract was within the power of the Legislature.

Discussion by FIELD, C.J., of the nature of the police power and of the scope of its exercise.

The provision of St. 1939, c. 482, § 1, purporting to revoke without payment of compensation the Atlantic Avenue location granted to the Boston Elevated Railway Company by St. 1894, c. 548, and St. 1897, c. 500, was void as impairing the obligation of a contract in violation of art. 1, § 10, of the Federal Constitution and as interfering with property of the company in violation of the Fourteenth Amendment thereto and of art. 10 of the Declaration of Rights of the Commonwealth; and it could not be sustained as an exercise of the police power under conditions existing at the time of its enactment.

The provisions of St. 1939, c. 482, § 1, relating to a declaration of forfeiture and to revocation are not so dependent upon each other that the declaration of forfeiture cannot stand upon the revocation being adjudged unconstitutional.

It was within the power of the Legislature to prescribe a tribunal, and a proceeding other than quo warranto, in which the function, strictly judicial, of determining whether an elevated railway company had forfeited its location for breach of condition in the statutory grant thereof might be exercised; § 2 of St. 1939, c. 482, was a proper exercise of that power, and § 1 showed that the Commonwealth did not waive such breach but insisted upon the forfeiture resulting therefrom.

Notwithstanding the provisions of the grant of location of the Atlantic Avenue location to the Boston Elevated Railway Company in substance preventing revocation of the location by the Commonwealth except upon payment of compensation and except in case of failure of the company to construct a railway thereon, and the absence of an express condition respecting forfeiture, the grant and contract were subject to an implied condition subsequent that the location might become forfeited if it was not used for the purpose for which it was granted.

Forfeiture of a location for an elevated railway for breach of an implied condition of the grant of the location that it should be used for the purpose for which it was granted was not unconstitutional as impairing the obligation of a contract or as depriving the company of its property without due process of law or without compensation.

Neither the fact that the Atlantic Avenue structure of the Boston Elevated Railway Company had cost the company a large amount of money; nor the fact that there had been further large expenditures for damages paid to private persons on account of additional servitude upon properties adjoining the structure; nor the fact that part of the location was over private lands, precluded the implication of a condition that the location was to be used for the purpose for which it was granted or the enforcement of that condition by forfeiture of the location for a material breach thereof.

It was an implied condition of the grant to the Boston Elevated Railway Company of the Atlantic Avenue location that, after construction within the specified time, there should be continuous operation of passenger service; and a determination to cease to operate such service shown by agreed facts to be for reasons of economy and for an indefinite period and followed by actual cessation for more than ten months warranted a finding of a breach of that condition resulting in a forfeiture of the location, although in the circumstances the structure was used for electric cables and air pipe lines in connection with the company's other railway operations, and although, if left standing, it might be used as an alternative route for passenger service if operation on its tunnel route were interrupted, and although some undetermined circumstance in the future might make the structure a necessary element in furnishing rapid transit service to the community.

By the provisions of the contract made between the Boston Elevated Railway Company and the Commonwealth by the Public Control Act, as set out in Spec. St. 1918, c. 159; St. 1931, c. 333; St. 1935, c. 99, the title to the property remained in the company, but its management and operation were placed in the Public Trustees, who, although acting as public officers for the carrying out of a public purpose, act by authority of the company and in its behalf; and their acts within the scope of their authority are to be regarded as the acts of the company.

It was within the scope of the authority of the Public Trustees of the Boston Elevated Railway Company under the Public Control Act to discontinue in behalf of the company the use of the Atlantic Avenue location for the transportation of passengers, although thereby the location was forfeited.

Forfeiture of the Atlantic Avenue location of the Boston Elevated Railway Company by the Public Trustees' ceasing to operate passenger service thereon would not preclude compliance with the provisions of the Public Control Act for ultimate reversion to the company of control of its system.

No waiver by the Commonwealth of the implied condition of the grant of the Atlantic Avenue location of the Boston Elevated Railway Company, that it be used for the purpose for which it was granted, was expressed or implied in the Public Control Act.

Forfeiture of the Atlantic Avenue location of the Boston Elevated Railway Company for failure to operate passenger service thereon extended to the entire location including that on private lands.

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on September 8, 1939.

The case was reserved by *Cox*, J.

*R. H. Holt*, (*J. S. Dickey* with him,) for the plaintiff.

*E. O. Proctor*, Assistant Attorney General, for the Commonwealth.

*R. H. Hopkins,* Assistant Corporation Counsel, (*H. Freed,* Assistant Corporation Counsel, with him,) for the city of Boston and others.

*W. B. Downey,* (*C. B. Gleason* with him,) for Trustees of the Boston Elevated Railway Company.

FIELD, C.J. This is a petition in equity filed in this court under the provisions of St. 1939, c. 482, by the Boston Elevated Railway Company (herein referred to as the company) by its directors against the Commonwealth, the city of Boston, the officers of the city of Boston constituting the transit department thereof (herein referred to as the transit department), and the board of trustees of the company. The city of Boston and the officers thereof constituting its transit department filed an answer in which the Commonwealth joined. The board of trustees of the company also filed an answer. The case was reserved by a single justice of this court — without decision by him — "upon the pleadings and a stipulation of agreed facts for the consideration and determination of the Full Court." G. L. (Ter. Ed.) c. 214, § 31.

Statute 1939, c. 482, §§ 1, 2, 3, are as follows:

"SECTION 1. The right of the Boston Elevated Railway Company, hereinafter called the company, to construct, maintain and operate its elevated railway structure located in or upon Commercial street, Atlantic avenue, Beach street and Harrison avenue and public or private lands or ways in the city of Boston between cross girder number 164 over 201 east of Keany square and cross girders numbers 1E and 1W near Washington street, hereinafter called the structure, is hereby declared forfeited, said structure no longer being operated in the public service for the purpose for which the franchise of the company to operate an elevated structure on the said location was granted, and constituting a nuisance in the public highway and unreasonably interfering with the enjoyment and use of said highway to the detriment of the public health and safety. The said location and the right of the company to construct, maintain and operate an elevated railway structure thereon are hereby revoked.

"SECTION 2. The company, acting by its board of directors, may, within thirty days of the effective date of this act, file a petition in equity in the supreme judicial court to determine whether there is just cause for the revocation and declaration of forfeiture provided for in section one. The supreme judicial court shall have jurisdiction in equity to determine the issues raised in such petition and to affirm, modify, or annul the said revocation and declaration of forfeiture, and service of an order of notice upon the state secretary shall be sufficient. Upon the filing of such a petition the court may stay any action under the following sections of this act until such time as the issues raised in such petition have been finally determined, or for any shorter period as justice may require. If a jury trial shall be claimed by the company the court may transfer said cause to the superior court for trial.

"SECTION 3. Within thirty days after the expiration of the period within which a petition under the preceding section may be filed, without the filing of any such petition, or within thirty days after the final disposition of proceedings upon such a petition dismissing it or otherwise sustaining the forfeiture and revocation provided for in section one, the company shall proceed without delay at its own expense to remove said structure above its foundations and to put the surface of the public ways disturbed by such removal into as good condition as the adjacent surface of said ways, and to restore to good condition sidewalks and buildings affected by such removal. If the company fails to begin the removal, as herein directed, or to complete it within one year thereafter, the transit department of the city of Boston shall remove the structure at the expense of the company, and such expense shall be recoverable from the company in an action at law."

Section 4 of the statute prescribes the manner in which the transit department of the city of Boston shall carry out the duties imposed upon it by said § 3, and includes provisions that the "transit department may sell as salvage or otherwise the structure and any appurtenances thereof," that the "proceeds of such sales shall be used to pay the

cost of removal or shall be credited against such cost," and that in "the event that such proceeds exceed such cost, the excess shall be turned over to the treasurer of said city and credited to the Special Account, Sales of City Property as carried on the books of said city."

The prayers of the petition, other than a prayer for notice and for a temporary stay of action under St. 1939, c. 482, §§ 3, 4, are (a) that the court "determine that there exists no just cause for the revocation and declaration of forfeiture contained in Section 1 of said Chapter 482 of the Acts of 1939, and that the provisions thereof are void and of no effect," (b) that the court "issue a permanent injunction enjoining the Public Trustees from proceeding to remove said Atlantic Avenue elevated structure, and also enjoining the transit department of the city of Boston from removing or attempting to remove said structure at the expense of the company," and (c) for general relief.

First. No question is raised as to the jurisdiction of this court to entertain the petition. St. 1939, c. 482, § 2, provides expressly that the company may "file a petition in equity in the supreme judicial court to determine whether there is just cause for the revocation and declaration of forfeiture provided for in section one," and expressly confers upon the Supreme Judicial Court "jurisdiction in equity to determine the issues raised in such petition and to affirm, modify, or annul the said revocation and declaration of forfeiture." The company by filing the petition under the statute waived all objections to the determination in the proceeding authorized thereby of the issues described by the statute as the issues to be determined in such proceeding. Since the company has taken advantage of the protection given by the statute by seeking review of legislative action in the statutory proceeding, it can enjoy such protection only upon the terms set out in the statute. *Stevens, landowner,* 228 Mass. 368, 373–374. *Bogigian* v. *Commissioner of Corporations & Taxation,* 248 Mass. 545, 547. *Barnes* v. *Springfield,* 268 Mass. 497, 503. And the respondents make no objection to the determination of the issues in this proceeding.

Moreover, there is no sound basis for objection to the jurisdiction of the court to determine the issues described in the statute, a matter that it is the duty of the court to consider on its own motion. See *New York Life Ins. Co.* v. *Hardison*, 199 Mass. 190, 196–197. The issues, under the statute properly interpreted, that are to be determined by the court are proper for judicial determination. The statute is not to be interpreted as conferring upon the court jurisdiction to determine any question of expediency — of legislative or executive policy. Such a question cannot be turned over to the courts. Art. 30 of the Declaration of Rights of the Constitution of the Commonwealth. *Selectmen of Milton* v. *Justice of the District Court of East Norfolk*, 286 Mass. 1, 4. *Opinion of the Justices*, 300 Mass. 596, 600. But the fundamental question to be determined by the court, as provided by the statute, is whether as matter of law "there is just cause for the revocation and declaration of forfeiture" by legislative action. This question, in substance a single issue on the merits of the case, is "cognizable by the courts in the exercise of judicial attributes" when properly raised between litigants. See *Attorney General* v. *Pelletier*, 240 Mass. 264, 300; *Opinion of the Justices*, 300 Mass. 596, 600; *Attorney General* v. *Secretary of the Commonwealth*, 306 Mass. 25, 28–29. See also *Janvrin, petitioner*, 174 Mass. 514; *American Employers' Ins. Co.* v. *Commissioner of Insurance*, 298 Mass. 161, 169–170. In the statutory proceeding begun by the company this issue is raised between litigants. And the statute expressly or by necessary implication confers jurisdiction upon the court to enter a decree giving effect to its decision upon this issue in some form that is not beyond the scope of the jurisdiction in equity that may be conferred upon the court by statute. Compare *Fall River* v. *Public Service Commissioners*, 228 Mass. 575; *Donham* v. *Public Service Commissioners*, 232 Mass. 309; *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 262 Mass. 137, 140, 152; *Latherizer Corp.* v. *Department of Public Utilities*, 278 Mass. 454; *American Employers' Ins. Co.* v. *Commissioner of Insurance*, 298 Mass. 161, 170. See also

*Foote* v. *Gibbs*, 1 Gray, 412, 413; *Corbett* v. *Craven*, 193 Mass. 30, 37; *Coyle* v. *Taunton Safe Deposit & Trust Co.* 216 Mass. 156, 159–161.

Second. At the threshold of the case it is necessary to define more explicitly the issue that, under the provisions of St. 1939, c. 482, § 2, is to be determined upon this petition, and to define the extent of the waiver made by the company by filing the petition for the determination of this issue.

1. The company, as agreed by the parties, "is a corporation duly organized and existing under" St. 1894, c. 548, as amended by St. 1897, c. 500. See *Roosevelt* v. *Hamblin*, 199 Mass. 127. According to the terms of § 1 of the former statute certain named persons "their associates and successors" were "made a corporation." Its "chief corporate purpose," as stated in *Opinion of the Justices*, 261 Mass. 556, 594, "is to afford carriage of passengers for hire within parts of Boston and nearby cities and towns by means of cars moved mainly by electricity on and through elevated structures, subways, tunnels and surface street railway tracks and other means adapted to that end. . . . The nature of its business is public." By said § 1 and related statutory provisions the Commonwealth granted "the general franchise to be a corporation" and "the subordinate franchise to manage and carry on its corporate business, without which its franchise to be a corporation can have little more than a nominal existence." *Richardson* v. *Sibley*, 11 Allen, 65, 67. See also *Commonwealth* v. *Smith*, 10 Allen, 448, 455–456; *Commonwealth* v. *Lancaster Savings Bank*, 123 Mass. 493, 497. The present case does not involve, unless incidentally, either the general franchise of the company to be a corporation or the subordinate franchise above described. Compare *Commonwealth* v. *Fitchburg Railroad*, 12 Gray, 180; *Opinion of the Justices*, 237 Mass. 619, 623. See also *Stillwater* v. *Hudson Valley Railway*, 255 N. Y. 144, 150–151. St. 1939, c. 482, does not purport to declare forfeited or to revoke either of these franchises.

2. Statute 1894, c. 548, § 6, as amended by St. 1897,

·c. 500, §§ 2, 3, provides that "Said corporation may construct lines of elevated railway according to such plans or systems as the board of railroad commissioners may approve, to be operated by electricity or other motive power except steam, upon the following locations, and may equip, maintain and operate engines, motors and cars thereon, to wit: —" (Here follow descriptions of "locations" in paragraphs numbered from first to ninth inclusive.) In other sections of the statute reference is made in terms to "locations." St. 1897, c. 500, § 4, refers to "the locations granted by paragraphs fourth and fifth," and § 19 refers to the "locations of or right to maintain any elevated lines or structures" of the company. See also § 21. It is apparent that the word "locations" is used in its ordinary sense as applied to street railways, that is, in the sense that a location, except on private premises, is "in the nature of a privilege or permit to use the public ways given by cities and towns by virtue of authority from the Legislature for the purpose of facilitating public travel and accommodation," or given directly by the Legislature. *Springfield* v. *Springfield Street Railway,* 182 Mass. 41, 48. See *Arlington Board of Survey* v. *Bay State Street Railway,* 224 Mass. 463, 469. See also *Attorney General* v. *Metropolitan Railroad,* 125 Mass. 515, 517–518; *Selectmen of Amesbury* v. *Citizens Electric Street Railway,* 199 Mass. 394, 396–397; *Sawin* v. *Connecticut Valley Street Railway,* 213 Mass. 103, 107; *Boston, Worcester &. New York Street Railway* v. *Commonwealth,* 301 Mass. 283, 285. The word "locations" as applied to street railways on private land has a somewhat different meaning. Such a location is in the nature of an easement in such land or of ownership thereof with permission from public authorities to the street railway company to construct and maintain its railway upon such land. *Connecticut Valley Street Railway* v. *Northampton,* 213 Mass. 54, 62–63. With respect to such locations on private land this court said in the case just cited, at page 64: "And while there are many instances where street railway tracks are legally located and maintained on private land, still it nevertheless is true that the purpose for which ·street rail

way companies are chartered is to accommodate the public travel in public ways, that the right to construct and maintain tracks in private lands is merely incidental to this purpose, and in no way considerable as compared with the right to maintain tracks in the streets, that the right in the streets is simply personal estate, and moreover that this right is the one fundamental right upon which the street railway company must rely to transact the business for which it was chartered."

The location in question in this case is a part of the location granted by paragraph seventh of St. 1894, c. 548, § 6, as amended by St. 1897, c. 500, § 3, described as follows: "Commencing at a point at or near the corner of Washington and Castle streets," thence upon and over private lands and streets "to Harrison avenue; thence upon and over Harrison avenue to Beach street; thence upon and over Beach street to Cove street; thence upon and over Cove street to Federal street, or upon and over the new street to be constructed by the city of Boston, to Atlantic avenue; thence upon and over Atlantic avenue, Commercial street and Causeway street to" a bridge then being built by the transit commission under the provisions of St. 1894, c. 548, "and to Merrimac street."

The company in 1901 completed the construction of an elevated structure — and placed it in operation — upon the location so granted and upon other locations granted by said St. 1894, c. 548, as amended by St. 1897, c. 500, "from Sullivan Square, in that part of the city of Boston called Charlestown, to the northerly terminus of the Tremont Street Subway in said city of Boston, and from the southerly terminus of the said Tremont Street Subway to Dudley Street, in that part of said Boston known as Roxbury, thereby forming a continuous line of railway adapted to third-rail rapid transit train operation from Sullivan Square to Dudley Street, and also a line of elevated railway by way of Atlantic Avenue and other ways in said Boston connecting the portion of said elevated structure north of said Tremont Street Subway with the portion of said structure south of said Tremont Street Subway, thereby

forming a continuous line of elevated railway from Sullivan
Square to Dudley Street for use by the same type of third-
rail rapid transit trains as those which are operated through
the Tremont Street Subway." In 1908, the company under
authority of St. 1902, c. 534, connected its elevated railway
lines with the Washington Street tunnel at both ends and
disconnected said lines from the Tremont Street subway.
The use of the Washington Street tunnel "commenced No-
vember 30, 1908, and has continued since that date." The
"operation of third-rail rapid transit trains through said
Tremont Street Subway was discontinued on November 30,
1908, and it has not been resumed since that date." These
and related facts as appearing in the "stipulation of agreed
facts" are set forth more fully in a footnote.[1]

---

[1] "3. Boston Elevated Railway Company constructed lines of elevated
railway pursuant to the provisions of said Chapter 548, Acts of 1894, and
Chapter 500, Acts of 1897, upon certain locations extending from Sullivan
Square, in that part of the city of Boston called Charlestown, to the northerly
terminus of the Tremont Street Subway in said city of Boston, and from the
southerly terminus of the said Tremont Street Subway to Dudley Street,
in that part of said Boston known as Roxbury, thereby forming a continuous
line of railway adapted to third-rail rapid transit train operation from Sulli-
van Square to Dudley Street, and also a line of elevated railway by way of
Atlantic Avenue and other ways in said Boston connecting the portion of
said elevated structure north of said Tremont Street Subway with the por-
tion of said structure south of said Tremont Street Subway, thereby forming
a continuous line of elevated railway from Sullivan Square to Dudley Street
for use by the same type of third-rail rapid transit trains as those which are
operated through the Tremont Street Subway. The lines of the Elevated
from Sullivan Square to the northerly end of the Tremont Street Subway
and from the southerly end of the Tremont Street Subway to Dudley Street
were completed and operation thereof commenced June 10, 1901. The con-
nection between the north and south ends of said elevated railway lines by
way of Atlantic Avenue was completed and placed in operation on August
22, 1901. The connection between the north and south ends of said elevated
railway lines by way of the Tremont Street Subway was completed and
placed in operation on June 10, 1901.

"4. Boston Elevated Railway Company constructed an extension of its
elevated railway from Dudley Street to Forest Hills, in the city of Boston,
which was completed and operation thereof commenced November 22, 1909;
and, further, constructed an extension of its elevated railway lines from
Sullivan Square to the city of Everett, which was completed and placed in
operation on March 15, 1919.

"5. Boston Elevated Railway Company became lessee of the properties
of the West End Street Railway Company, a Massachusetts corporation,
under a lease dated December 9, 1897, by which it became sublessee of said
Tremont Street Subway under a contract made between the city of Boston
and the West End Street Railway Company for the use of said Subway dated
December 7, 1896, by virtue of which Boston Elevated Railway Company had
the right to operate its elevated railway trains through said Tremont Street
Subway upon the completion of its railway structures connecting therewith.

"6. The city of Boston, acting through the Boston Transit Commission,
pursuant to authority granted by Chapter 534 of the Acts of 1902, constructed

By St. 1939, c. 482, § 1, the Legislature purported to declare forfeited the "right of the Boston Elevated Railway Company . . . to construct, maintain and operate its elevated railway structure" on the part of the location granted to the company by paragraph seventh of St. 1894, c. 548, § 6, as amended, "in or upon Commercial street, Atlantic avenue, Beach street and Harrison avenue and public or private lands or ways in the city of Boston between cross girder number 164 over 201 east of Keany square and cross girders numbers 1E and 1W near Washington street," and purported to revoke "said location and the right of the company to construct, maintain and operate an elevated railway structure thereon." The location so described and the elevated structure thereon are herein referred to respectively as the Atlantic Avenue location and the Atlantic Avenue structure. This location and this structure as appears from plans that are incorporated by reference in the "stipulation of agreed facts" are about eleven thousand, four hundred thirteen feet in length. The northern terminus of the Atlantic Avenue location and the Atlantic Avenue structure, referred to in the statute as "cross girder number 164 over 201 east of Keany square," is somewhat east of the point at which the elevated structure upon this location joins the elevated structure at the northern end of the Washington Street tunnel, and the southern terminus of the Atlantic Avenue location and the Atlantic Avenue structure, described in the statute as "cross girders numbers 1E and 1W near Washington street," is somewhat north of the

---

a tunnel designed for the accommodation of two tracks for use by elevated cars or trains, known as the 'Washington Street Tunnel,' and the Boston Elevated Railway Company entered into a contract with the city of Boston dated September 25, 1902, for the sole and exclusive use of said Tunnel for a term of twenty-five years from the beginning of the use of said Tunnel. This contract has been from time to time extended and the term thereof under the extension now in effect runs to July 1, 1962, and thereafter unless and until terminated by notice given either by the city of Boston or by the Company. When the Boston Elevated Railway Company entered into the contract for the use of the Washington Street Tunnel it was authorized by Sections 11 and 12 of said Chapter 534, Acts of 1902, to connect its elevated railway lines with said Washington Street Tunnel at both ends and to disconnect said lines from the Tremont Street Subway, and this was done. The use of said Washington Street Tunnel commenced November 30, 1908, and has continued since that date. The operation of third-rail rapid transit trains through said Tremont Street Subway was discontinued on November 30, 1908, and it has not been resumed since that date."

point at which the elevated structure upon this location joins the elevated structure at the southern end of the Washington Street tunnel. The Atlantic Avenue structure "consists of double tracks throughout with third rail electric connections and necessary ties and stringers resting upon steel cross girders, which are supported by upright steel columns located in part upon sidewalks and in part within the travelled portion of the streets, except where the structure is constructed over privately owned land." The structure is on privately owned land for a distance of about three hundred feet from Washington Street to Harrison Avenue. The Atlantic Avenue structure "is a part of the company's entire elevated structure extending from Everett to Forest Hills as a continuous line of elevated railway."

It appears in the "stipulation of agreed facts" that if "all other conditions remain unchanged, the revocation of the company's right to maintain said Atlantic Avenue Section and the removal of the structure therefrom will sever said continuous elevated structure and the elevated structures thereafter owned by the company will be connected for the purpose of operating elevated trains only by the Washington Street Tunnel. The said Atlantic Avenue structure in its present condition is capable of being used as an alternative route upon short notice in the event transportation through the Washington Street Tunnel should be interrupted. The company derives its right to operate its elevated trains through the Washington Street Tunnel from the contract for the use thereof."

3. The action of the Legislature by St. 1939, c. 482, § 1, is in two forms: (a) a declaration of forfeiture of the company's Atlantic Avenue location, the elevated structure thereon "no longer being operated in the public service for the purpose for which the franchise of the company to operate an elevated structure on the said location was granted, and constituting a nuisance in the public highway and unreasonably interfering with the enjoyment and use of said highway to the detriment of the public health and safety," and (b) a revocation of the "said location and the

right of the company to construct, maintain and operate an elevated railway structure thereon."

4. By § 2 of this statute the company is permitted to file in this court a petition in equity "to determine whether there is just cause for the revocation and declaration of forfeiture provided for in section one," and the court is given jurisdiction in equity "to determine the issues raised in such petition." As we have already said, the company by filing the petition has waived all objections to the determination of these issues upon the petition. But some of the respondents contend that the company by filing the petition has also waived all its rights to object to the constitutionality of the statute. In other words, they contend that the company is precluded from attacking in this statutory proceeding instituted by it the existence of legislative power to declare such a forfeiture or to make such a revocation. These respondents contend, in substance, that the existence of the power must be taken to be admitted for the purposes of the proceeding, and that the only question open in the proceeding is the propriety of the exercise of such power in the light of the facts appearing in the record.

We cannot accede to this contention. The proceeding was authorized by statute for the express purpose of permitting a judicial determination of the issue whether there was "just cause" for the revocation and declaration of forfeiture of the location in question. Obviously the company by bringing the statutory proceeding did not waive its right to such a determination therein. And the statute does not by its terms limit the issue to be determined in connection with the declaration of forfeiture to the question whether the grounds thereof stated in the statute exist as matter of fact, but by necessary implication the statute includes within this issue the question whether these grounds, if they exist as matter of fact, constitute, as matter of law, "just cause" for the declaration of forfeiture. The statute, moreover, states no grounds for the revocation, unless it is to be implied that the revocation is based on the same grounds as the declaration of forfeiture. As matter of law there can be no "just cause" for such a revocation or such

a declaration of forfeiture if thereby constitutional rights of the company are impaired. And a determination of the question whether particular facts constitute, as matter of law, such "just cause" necessarily involves a determination of the standard of "just cause," and this standard, for the purpose of testing the validity of statutory action, is fixed by the State and the Federal constitutions. The issue to be determined, therefore, includes the question of the constitutionality of the revocation and declaration of forfeiture of the location for an elevated structure granted to the company by St. 1894, c. 548, as amended, that is described in St. 1939, c. 482, § 1 — the Atlantic Avenue location.

The company, by filing the petition for the determination of this issue, did not waive the question of constitutionality included therein. The situation is different in this respect from that in which procedural rights conferred by the Constitution are waived. See, for example, *Fratantonio* v. *Atlantic Refining Co.* 297 Mass. 21. It is different also from that in cases such as petitions for the assessment of damages for takings by eminent domain that are predicated upon the existence of valid takings. See *Barnes* v. *Springfield*, 268 Mass. 497, 503. Compare *Stevens, landowner*, 228 Mass. 368, 373; *Cahalan* v. *Department of Mental Health*, 304 Mass. 360, 363–364. The company is seeking protection in this statutory proceeding against an alleged unconstitutional revocation and declaration of forfeiture of its Atlantic Avenue location "upon the terms set out in the statute." *Stevens, landowner*, 228 Mass. 368, 374. Moreover, since St. 1939, c. 482, was passed by the Legislature, and consequently, apart from constitutional limitations, supersedes all prior laws, statutory or other, in conflict therewith, the only issue for determination is whether, on the facts appearing in the record, the revocation and declaration of forfeiture of the Atlantic Avenue location purporting to be made thereby impair the constitutional rights of the company. See *Selectmen of Brookline, petitioners*, 236 Mass. 260, 269.

Third. We now proceed to consider upon its merits the

issue whether, on the facts appearing in the record, the revocation and declaration of forfeiture by St. 1939, c. 482, of the Atlantic Avenue location, granted to the company by St. 1894, c. 548, as amended by St. 1897, c. 500, impair the constitutional rights of the company.

The company contends that such revocation and declaration of forfeiture are in violation of (a) art. 10 of the Declaration of Rights of the Constitution of the Commonwealth, particularly the provision therein that "whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor," (b) the Fourteenth Amendment to the Constitution of the United States, particularly the provision thereof that no State shall "deprive any person of life, liberty, or property, without due process of law," and (c) the provision of art. 1, § 10, of the Constitution of the United States, that no State shall pass any "law impairing the obligation of contracts."

Statute 1939, c. 482, purports, subject to judicial review, to terminate the company's Atlantic Avenue location by revocation thereof and by a declaration of forfeiture thereof. If reasonably possible the statute is to be interpreted so as to effectuate this purpose and so "as not to render it contrary to the terms of the Constitution." "Every rational presumption will be indulged in favor of the validity of an act of the legislative department of government." *Commonwealth* v. *S. S. Kresge Co.* 267 Mass. 145, 148. See also *Talbot* v. *Hudson,* 16 Gray, 417, 422; *Moore* v. *Election Commissioners of Cambridge,* 309 Mass. 303, 311–312. The action of the Legislature by this statute cannot be annulled under the provisions of St. 1939, c. 482, § 2, if it is constitutional either as a revocation of the Atlantic Avenue location or as a declaration of forfeiture thereof. While the respondents, the Commonwealth, the city of Boston and the transit commission do not rely upon said St. 1939, c. 482, as a revocation of the Atlantic Avenue location, the revocation and the declaration of forfeiture are somewhat related and we consider the statute in each of these aspects.

The Atlantic Avenue location granted to the company

by St. 1894, c. 548, § 6, as amended, in the terms of the statute, was a right to "construct lines of elevated railway" on such location and to "equip, maintain and operate engines, motors and cars thereon." Such a location was in the general nature of a street railway location, except that an *elevated* railway was expressly authorized. The nature of a street railway location in a public way was described in *Sawin* v. *Connecticut Valley Street Railway*, 213 Mass. 103, 107, as follows: "A street railway company acquires by its location a right in the nature of a license to occupy portions of the street for purposes of its travel. . . . Its right is a peculiar privilege to modify to some extent the use of the public way, and by such modifications to enjoy in common with others the easement of public travel, according to the limitations and advantages which accrue from the employment of rails and cars." It was said in *Boston, Worcester & New York Street Railway* v. *Commonwealth*, 301 Mass. 283, 285, of street railways that they "pay no money for their street locations and they acquire by them no property rights in land and no easements in the streets." And it was said in the same case at pages 284–285 that from "the very beginning locations for street railways have been granted, whenever the public interest required, by public authority for an unlimited period of time, but subject always to revocation without compensation by the particular authority and in the particular manner prescribed by law when further continuance was no longer compatible with the public interest." For these principles numerous cases are cited. See pages 285–286. In view of the nature of a street railway location, as herein stated, as "a license [to the street railway company] to occupy portions of the street for purposes of its travel," a revocation thereof by public authority ordinarily does not impair any obligation of contract, deprive the company of property without due process of law or constitute an appropriation of property to public uses without reasonable compensation in the constitutional sense. See also *Springfield* v. *Springfield Street Railway*, 182 Mass. 41, 47–48; *Connecticut Valley Street Railway* v. *Northampton*, 213 Mass. 54, 64; *Northampton* v. *Northamp-*

*ton Street Railway,* 231 Mass. 540, 545; *Burgess* v. *Mayor &
Aldermen of Brockton,* 235 Mass. 95, 100.

These principles, subject to certain important exceptions
and limitations, are applicable to the Atlantic Avenue lo-
cation granted to the company, since by St. 1897, c. 500,
§ 21, it is provided that except "as otherwise expressly pro-
vided in said . . . [St. 1894, c. 548] and by this act, said
corporation shall have all the powers and privileges and be
subject to all the duties, liabilities and restrictions set forth
in general laws now or hereafter in force relating to street
railway companies, so far as the same may be applicable."

The company, therefore, cannot prevail in this proceeding
unless on the ground of some exception to or limitation upon
the application of the principles above stated relating to
street railway locations. The exception particularly relied
upon by the company is the provision in St. 1897, c. 500,
§ 19, that the "locations of or right to maintain any elevated
lines or structures of the Boston Elevated Railway Company
shall not be subject to revocation except in the manner and
on the terms prescribed in sections seven and eight of chap-
ter one hundred and twelve of the Public Statutes: provided,
however, that any location upon which said corporation has
not constructed its railroad within ten years from the pas-
sage of this act shall be subject to revocation by the legis-
lature; but no location upon which said corporation has
begun the construction of its railroad within said period
shall be subject to revocation if the same be completed
within three years thereafter." Pub. Sts. c. 112, §§ 7, 8,
herein referred to, provide respectively that the Common-
wealth may purchase of a railroad corporation "its road and
all its franchise, property, rights, and privileges" upon
terms of payment therein provided, and that the Common-
wealth "may at any time take and possess the road, fran-
chise, and other property of a railroad corporation" upon
terms as to notice and payment therein provided. These
sections are set out in full in a footnote.[1] They now appear

---

[1] Pub. Sts. c. 112, § 7: "The commonwealth may at any time during the
continuance of the charter of a railroad corporation, after the expiration of
twenty years from the opening of its road for use, purchase of the corpora-
tion its road and all its franchise, property, rights, and privileges, by paying

in substance, though changed in form and with somewhat different provisions with respect to damages in the case of a taking by eminent domain, in G. L. (Ter. Ed.) c. 160, §§ 6, 7. St. 1897, c. 500, § 21, previously quoted in part, contains the further provision that "the provisions of chapter one hundred and thirteen of the Public Statutes or other general laws relating to the alteration or revocation of locations of street railway companies, shall not be deemed applicable to the locations or routes for elevated railroads granted to said corporation." Said c. 113 provides for the alteration and revocation of street railway locations by boards of aldermen or selectmen. See now G. L. (Ter. Ed.) c. 161, §§ 71, 77.

The company also relies, in connection with the provisions of St. 1897, c. 500, upon the provision in St. 1894, c. 548, § 8, that the "location, construction, maintenance or operation of said lines of railway in any public or private way shall be deemed an additional servitude and entitle lessees, mortgagees and other parties having an estate in such way or in premises which abut thereon, and who are damaged by reason of the location, construction, maintenance and operation of said lines of railway, to recover reasonable compensation in the manner herein provided." It appears from the "stipulation of agreed facts" not only that the company has constructed an elevated structure on locations granted to it by St. 1894, c. 548, as amended by St. 1897, c. 500, including the Atlantic Avenue location, but also that, if material, "the records of the company show that the cost of the said Atlantic Avenue Section to January 21, 1939, was approximately $5,636,330, of which

---

therefor such sum as will reimburse to it the amount of capital paid in, with a net profit thereon of ten per cent a year from the time of the payment thereof by the stockholders to the time of the purchase." § 8: "The commonwealth may at any time take and possess the road, franchise, and other property of a railroad corporation, after giving to it one year's notice in writing; and shall pay therefor such compensation as may be awarded by three commissioners, to be appointed by the supreme judicial court, who shall be sworn to appraise the same justly and fairly, and shall estimate and determine all damages sustained by it by such taking; and a corporation aggrieved by the determination of said commissioners may have its damages assessed by a jury of the superior court in the county of Suffolk, in the same manner as is provided by law with respect to damages sustained by reason of the laying out of ways in the city of Boston."

approximately $2,793,548 represents the amount paid by the company as damages on account of the additional servitude created by the location, construction and maintenance of said Section of the elevated railway."

The contentions of the company on this branch of the case are that "acceptance of the charter by the company, its construction of the elevated railway and the payment of damages to property owners clearly created a contract between the Commonwealth and the company with respect to the franchise and also vested in the company an actual easement in the underlying and adjacent estates. . . . This contract vested in the company a property right which the Legislature cannot take away without compensation and any attempt to do so not only violates Article X, Part the First, of the Constitution of Massachusetts, but also violates Sec. 10, Art. I of the Federal Constitution as well as the Fourteenth Amendment thereof. . . . Therefore, the company's rights affected by legislative declaration of forfeiture are three classes of property rights — its franchise, its interest in the land upon which the structure is built, and in the abutting estates, and its ownership in the structure itself."

A. Revocation. Statute 1939, c. 482, cannot take effect as a revocation of the Atlantic Avenue location in the sense in which the word "revocation" is ordinarily used in relation to street railway locations, that is, in the sense of a repeal of a grant of a special privilege at the pleasure of the Legislature, or other authority in which the power to repeal is vested, without payment of compensation therefor as in the case of an ordinary street railway location. Compare *Public Service Commission of Puerto Rico* v. *Havemeyer,* 296 U. S. 506, 517.

1. It is a revocation of this nature that is expressly prohibited by St. 1897, c. 500, §§ 19, 21. That statute not only provides that the general laws relating to "revocation of locations of street railway companies, shall not be deemed applicable to the locations or routes for elevated railroads granted to said corporation" (§ 21), but also provides generally that the "locations of or right to main-

tain any elevated lines or structures of the Boston Elevated
Railway Company shall not be subject to revocation."
§ 19. The specific exceptions to the prohibition of revo-
cation contained in said § 19 amount to reservations of
the right to exercise the power of eminent domain and of
the right to purchase from the company its railroad and
"all its franchise, property, rights, and privileges" by
paying therefor an amount fixed by the statute. Pub.
Sts. c. 112, §§ 7, 8. G. L. (Ter. Ed.) c. 160, §§ 6, 7. Ob-
viously neither of these reserved rights was exercised by
said St. 1939, c. 482. Moreover, on the facts shown, the
railroad was completed within the time fixed by said § 19
so that, according to the terms of said section, the pro-
hibition therein of revocation has become applicable.

2. The grant to the company of the Atlantic Avenue
location with the statutory provisions herein referred to
against revocation constituted a contract between the
Commonwealth and the company — at least from the time
of the construction of the elevated structure upon such
location, if not from an earlier date — binding the Com-
monwealth not to revoke such location by a mere repeal
of the grant of such location at the pleasure of the Legis-
lature.

It clearly was the intention of the Legislature that the
statute should be so interpreted. It is to be assumed that
the Legislature intended that the statute should be effective
according to its terms if it was within the power of the Legis-
lature to make it so effective. The express provisions against
revocation would be substantially ineffective if they were
not binding upon the Commonwealth but were subject to
repeal at the pleasure of the Legislature. An intention to
pass an ineffective statute is not to be imputed to the Legis-
lature. *MacInnis* v. *Morrissey*, 298 Mass. 505, 509. These
provisions constituted inducements to the company to en-
gage in the transportation of passengers in the manner pro-
vided by the statute and to construct its railroad for that
purpose, and, particularly, so far as the present case is con-
cerned, to construct an elevated structure upon the Atlantic
Avenue location. The Legislature must have intended

that the company in constructing such an elevated structure should rely upon the irrevocable nature of the location granted therefor, and that, if the company acted in reliance thereon, the Commonwealth would be bound by contract not to repeal the location at the pleasure of the Legislature. It is unnecessary to consider at what point of time the statute, with respect to this location, became effective as a contract by reason of acceptance by the company, since undoubtedly there has been such acceptance.

The interpretation of the statute as constituting a contract by the Commonwealth against revocation of the Atlantic Avenue location is not precluded by the general provision of Pub. Sts. c. 105, § 3, in effect at the times respectively of the passage of St. 1894, c. 548, and of St. 1897, c. 500 (see now G. L. [Ter. Ed.] c. 155, § 3), that every "act of incorporation" passed after March 11, 1831, "shall be subject to amendment, alteration, or repeal at the pleasure of the general court." The specific provisions against revocation of locations obviously were intended to override this general provision to such an extent, if at all, as they were inconsistent therewith. And art. 59 of the Amendments to the Constitution of the Commonwealth, providing that "Every charter, franchise or act of incorporation shall forever remain subject to revocation and amendment," was not adopted until after the passage of St. 1897, c. 500, and cannot be invoked to affect the interpretation of the statute.

Moreover, the Legislature had the power, which it purported to exercise, to bind the Commonwealth by a contract such as is embodied in St. 1897, c. 500, that the Atlantic Avenue location should not be revoked without payment of compensation therefor. It was said by this court in *Springfield* v. *Springfield Street Railway*, 182 Mass. 41, 48, with respect to a street railway location: "No doubt the Legislature could have granted the defendant [the street railway company] the right to lay tracks in the streets of Springfield or have authorized the plaintiff [said city] to grant it in such terms that when accepted they would have constituted a contract between the plaintiff and defendant." (It is to be observed that at the time that case was decided

and at the time the location there in question was granted, Pub. Sts. c. 105, § 3, above referred to, was in effect.) The principle so declared is applicable to the Atlantic Avenue location. This location, with the provision against revocation, was granted by the Legislature in the exercise of its power as "the representative of the whole people . . . to control and regulate public property and public rights, to grant lands and franchises, to stipulate for, purchase and obtain all such property, privileges, easements and improvements, as may be necessary or useful to the public, to bind the community by their contracts therefor, and generally to regulate all public rights and interests." *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1, 32. See also *Commonwealth* v. *Essex Co.* 13 Gray, 239, 251; *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 416; *Opinion of the Justices*, 261 Mass. 523, 552; 293 Mass. 589, 599. The statutory provision whereby the irrevocable location was granted constituted primarily a regulation of the public rights in the streets in which such location was granted. In this respect it resembled the ordinary grant of a street railway location, as a grant, not of property in land or of an easement in the streets, but rather of "a right in the nature of a license to occupy portions of the street for purposes of its travel," revocable at the pleasure of the Legislature. *Sawin* v. *Connecticut Valley Street Railway*, 213 Mass. 103, 107. The Commonwealth, acting by the Legislature, however, had broad power to provide for the "accommodation of the public as to means of travel and transportation." *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 416. See also *Commonwealth* v. *Boston & Maine Railroad*, 3 Cush. 25, 45–46. And this power was broad enough to include the power to enter into a contract with the company, as an inducement to it to construct and operate an expensive elevated structure for the purpose of providing such means of travel and transportation, that the license to occupy the streets with such a structure should not be subject to revocation without the payment of compensation.

The Legislature was not precluded from entering into such a contract by the statutory reservation, above re-

ferred to, of the right to amend, alter or repeal an act of incorporation. Pub. Sts. c. 105, § 3. This general provision, being merely statutory, was not binding upon subsequent legislatures so as to restrict their power to enact statutes inconsistent therewith. The earlier statute has no higher standing than the later and may be superseded thereby wholly or in part when such is the clear legislative intention. See *Opinion of the Justices,* 294 Mass. 616, 622; 308 Mass. 601, 614. Nor was the Legislature precluded from entering into such a contract by the constitutional reservation, already referred to, contained in art. 59 of the Amendments to the Constitution, adopted after the passage of St. 1897,. c. 500. Whether the revocation of a location would have been within the scope of either of these reservations, if such reservation was not inapplicable for these reasons, need not be considered. See, however, *Commonwealth* v. *Essex Co.* 13 Gray, 239, 252–254; *Opinion of the Justices,* 261 Mass. 523, 552–553. And the provisions against revocation are not open to the objection that thereby the power of eminent domain is bargained away. This power is expressly reserved. But, even without such an express reservation, a reservation of this power undoubtedly would be implied since the State cannot divest itself thereof. *Eastern Railroad* v. *Boston & Maine Railroad,* 111 Mass. 125, 130–131. See also *Wellington, petitioner,* 16 Pick. 87, 101–102; *Central Bridge Corp.* v. *Lowell,* 4 Gray, 474, 480–481; *Pennsylvania Hospital* v. *Philadelphia,* 245 U. S. 20, 22–24.

Nor are the provisions against revocation open to the objection that thereby the legislative power ordinarily known as the police power was bargained away. This court has never undertaken to define the police power. *General Outdoor Advertising Co. Inc.* v. *Department of Public Works,* 289 Mass. 149, 180. As was said by Chief Justice Shaw in *Commonwealth* v. *Alger,* 7 Cush. 53, 85, it "is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise." See also *Slaughter-House Cases,* 16 Wall. 36, 62. And it was said by Chief Justice Knowlton in

*Commonwealth* v. *Strauss*, 191 Mass. 545, 550, and quoted with approval by Chief Justice Rugg in *Smith* v. *New England Aircraft Co. Inc.* 270 Mass. 511, 522–523: "The nature of the police power and its extent, as applied to conceivable cases, cannot easily be stated with exactness. It includes the right to legislate in the interest of the public health, the public safety and the public morals. If the power is to be held within the limits of the field thus defined, the words should be interpreted broadly and liberally. If we are to include in the definition, as many judges have done, the right to legislate for the public welfare, this term should be defined with some strictness, so as not to include everything that might be enacted on grounds of mere expediency." See also *Commonwealth* v. *Beaulieu*, 213 Mass. 138, 141–142; *Commonwealth* v. *Libbey*, 216 Mass. 356, 358. It is not unusual to describe the police power as "the right to enact laws in the interests of the public health, the public safety, the public morals and the general welfare." *Howes Brothers Co.* v. *Unemployment Compensation Commission*, 296 Mass. 275, 283. See *Veix* v. *Sixth Ward Building & Loan Association of Newark*, 310 U. S. 32, 38–39. Furthermore, it was said in *Atlantic Coast Line Railroad* v. *Goldsboro*, 232 U. S. 548, 558, quoted in *Opinion of the Justices*, 261 Mass. 523, 553, after defining the police power as "the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community," that "this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and . . . all contract and property rights are held subject to its fair exercise." See also *Commonwealth* v. *Boston & Northern Street Railway*, 212 Mass. 82, 85; *Grand Trunk Western Railway* v. *South Bend*, 227 U. S. 544, 553–554; *Chicago & Alton Railroad* v. *Tranbarger*, 238 U. S. 67, 77; *Denver & Rio Grande Railroad* v. *Denver*, 250 U. S. 241, 244. The right to exercise the police power in a proper manner, therefore, is necessarily impliedly reserved. See *Indiana* v. *Brand*, 303 U. S. 95, 108–109. And a proper legislative exercise of this power

contravenes no provision of the Constitution of the Commonwealth, and neither the contract clause nor the due process clause of the Constitution of the United States. See *Atlantic Coast Line Railroad* v. *Goldsboro*, 232 U. S. 548, 558, 559; *Chicago & Alton Railroad* v. *Tranbarger*, 238 U. S. 67, 76–77; *Denver & Rio Grande Railroad* v. *Denver*, 250 U. S. 241, 244. See also *Opinion of the Justices*, 261 Mass. 523, 553.

The police power herein referred to, however, though of broad scope, has a narrower signification than the police power in its comprehensive signification — as the term "police power" is sometimes used — "embracing in substance the whole field of State authority." *Dakota Central Telephone Co.* v. *South Dakota*, 250 U. S. 163, 185–186. And the principle that the police power cannot be bargained away does not wholly preclude the Legislature from dealing with public rights by contract so as to prevent subsequent legislative action in violation of such contract. See *Boston & Lowell Railroad* v. *Salem & Lowell Railroad*, 2 Gray, 1, 32; *Commonwealth* v. *Proprietors of New Bedford Bridge*, 2 Gray, 339, 347–348; *Commonwealth* v. *Essex Co.* 13 Gray, 239; *Central Bridge Corp.* v. *Lowell*, 15 Gray, 106, 116–118; *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 416; *Opinion of the Justices*, 261 Mass. 523, 552; 300 Mass. 607,. 612. "In every case like this involving an inquiry as to whether a law is valid, as an exertion of the police power, or void, as impairing the obligation of a contract, the determination must depend on the nature of the contract and the right of government to make it. The difference between the two classes of cases is that which results from the want of authority to barter away the police power, whose continued existence is essential to the well-being of society, and the undoubted right of government to contract as to some matters and the want of power, when such contract is made, to destroy or impair its obligation." *Grand Trunk Western Railway* v. *South Bend*, 227 U. S. 544, 553–554. Whatever may be the nature or description of the power of the Legislature to regulate public rights in the streets, the grant of the Atlantic Avenue

location to the company, coupled with a contract that it should not be revoked without the payment of compensation, was within the second of these classes of cases and, consequently, was not beyond the constitutional power of the Legislature, and created rights in the company that are within the protection of the constitutions of the Commonwealth and of the United States, though the exercise of such rights remains subject to proper regulation under the police power.   See *City Railway* v. *Citizens' Street Railroad,* 166 U. S. 557; *Walla Walla* v. *Walla Walla Water Co.* 172 U. S. 1; *Louisville* v. *Cumberland Telephone & Telegraph Co.* 224 U. S. 649; *Grand Trunk Western Railway* v. *South Bend,* 227 U. S. 544, 554; *Owensboro* v. *Cumberland Telephone & Telegraph Co.* 230 U. S. 58, 65–66; *Old Colony Trust Co.* v. *Omaha,* 230 U. S. 100; *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 191–193; *Northern Ohio Traction & Light Co.* v. *Ohio,* 245 U. S. 574, 585.   See also *Superior Water, Light & Power Co.* v. *Superior,* 263 U. S. 125, 135; *New Orleans Public Service, Inc.* v. *New Orleans,* 281 U. S. 682, 685–686.

3. Statute 1939, c. 482, considered solely in its aspect as a revocation at the pleasure of the Legislature of the Atlantic Avenue "location and the right of the company to construct, maintain and operate an elevated railway structure thereon" (see § 1), would be void as impairing, in violation of art. 1, § 10, of the Constitution of the United States, the obligation of the valid contract between the Commonwealth and the company that such location should be irrevocable.   And even though this location — as in the case of an ordinary street railway location — constituted merely a license and not a property right in land or an easement in the streets (see *Boston, Worcester & New York Street Railway* v. *Commonwealth,* 301 Mass. 283, 285), such a location made irrevocable, as here, by a valid contract is "property" within the protection of art. 10 of the Declaration of Rights of the Commonwealth and the Fourteenth Amendment to the Constitution of the United States.   See *Commonwealth* v. *Essex Co.* 13 Gray, 239, 253–254; *Central Bridge Corp.* v. *Lowell,* 15 Gray, 106, 117;

*Louisville* v. *Cumberland Telephone & Telegraph .Co.* 224 U. S. 649, 661; *Owensboro* v. *Cumberland Telephone & Telegraph Co.* 230 U. S. 58, 65–66; *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 191; *Northern Ohio Traction & Light Co.* v. *Ohio,* 245 U. S. 574, 585; *Superior Water, Light & Power Co.* v. *Superior,* 263 U. S. 125, 135, and cases cited. "Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States." *Lynch* v. *United States,* 292 U. S. 571, 579.

The grant of the Atlantic Avenue location was not subject to any reserved right in the Commonwealth to amend, alter or repeal such grant except so far as that result might be effected by the exercise of the police power as ordinarily understood — apart, of course, from the rights of the Commonwealth to exercise the power of eminent domain and the power expressly reserved by the statute to purchase the property of the company — neither of which rights was exercised by St. 1939, c. 482. No such right to amend, alter or repeal was reserved by the statute by which the location was granted. Nor, as already pointed out, on a proper interpretation of that statute, was the grant of such location subject to the statutory reservation in Pub. Sts. c. 105, § 3. See now G. L. (Ter. Ed.) c. 155, § 3. And whatever may be the scope of the similar constitutional reservation by art. 59 of the Amendments to the Constitution of the Commonwealth (see *Opinion of the Justices,* 261 Mass. 523, 552–553; compare *Commonwealth* v. *Boston & Northern Street Railway,* 212 Mass. 82, 84–85), adopted after the contract now in question-was made, it does not authorize legislation that impairs the obligation of the contract in violation of the Constitution of the United States. "A State can no more impair the obligation of a contract by her organic law than by legislative enactment; for, her constitution is a law within the meaning of the contract clause of the National Constitution." *New Orleans Gas Co.* v. *Louisiana Light Co.* 115 U. S. 650, 672.

Furthermore, the revocation of the Atlantic Avenue location, purporting to be made by said St. 1939, c. 482, cannot

be sustained as an exercise of the police power as ordinarily understood. Commonly regulation of the use of the streets is described as an exercise of the police power (see *Commonwealth* v. *Kingsbury,* 199 Mass. 542, 544, 546; *Commonwealth* v. *Slocum,* 230 Mass. 180, 190; *Burgess* v. *Mayor & Aldermen of Brockton,* 235 Mass. 95, 99), although some-. times as an exercise "by virtue of public ownership of the easement of travel over highways . . . [of] reasonable control over travel on them in the interest of the general welfare." *Barrows* v. *Farnum's Stage Lines, Inc.* 254 Mass. 240, 242–243. However regulation of the use of the streets may be described, the principles, already stated, supporting the conclusion that the Legislature had power to grant the Atlantic Avenue location and to contract that it should be irrevocable, necessarily support the conclusion that such a grant cannot be revoked, under the guise of regulating the use of the streets, on the ground of expediency, in the interest of the general welfare. See *Grand Trunk Western Railway* v. *South Bend,* 227 U. S. 544, 553–557; *Owensboro* v. *Cumberland Telephone & Telegraph Co.* 230 U. S. 58, 73–74. Compare *New Orleans Public Service, Inc.* v. *New Orleans,* 281 U. S. 682, 685–686. See also *Commonwealth* v. *Strauss,* 191 Mass. 545, 550; *Smith* v. *New England Aircraft Co. Inc.* 270 Mass. 511, 522–523. "A claim that action is being taken under the police power of the State cannot justify disregard of constitutional inhibitions. . . . Under it there is no unrestricted authority to accomplish whatever the public may presently desire." *Panhandle Eastern Pipe Line Co.* v. *State Highway Commission,* 294 U. S. 613, 619–622. As was said by Mr. Justice Holmes, in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 413–416: "As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

It may be that conditions might arise that would render the occupation of the streets by the company with an elevated structure on the granted location so inimical to the public health or to the public safety that the prohibition of such occupation in the exercise of the police power would be justified. But the record shows no such existing conditions, and no such existing conditions are within the judicial knowledge of the court. Neither the presumption of validity that attaches to legislative action generally (see *Moore* v. *Election Commissioners of Cambridge*, 309 Mass. 303, 311–312) nor any special recital in St. 1939, c. 482, warrants the assumption, in the light of known facts, that the continued occupation of the streets by the company with its elevated structure in accordance with its contract with the Commonwealth — however inexpedient the Legislature may deem such continued occupation under present conditions — is fraught with such danger to the public as to justify destruction of the company's rights under the contract by an exercise of the police power as ordinarily understood — danger beyond that naturally incidental to the occupation of the streets by the Atlantic Avenue structure, as contemplated in the grant of the Atlantic Avenue location to the company, constituting the contract between it and the Commonwealth (see *Panhandle Eastern Pipe Line Co.* v. *State Highway Commission*, 294 U. S. 613, 622), subject to proper regulation in the interest of health and safety under the police power. See *Grand Trunk Western Railway* v. *South Bend*, 227 U. S. 544.

B. Forfeiture. Though St. 1939, c. 482, by reason of constitutional limitations cannot take effect as a revocation of the Atlantic Avenue location, in the sense in which the word "revocation" is ordinarily used in relation to street railway locations, it does not follow necessarily that it cannot take effect as a "declaration of forfeiture" for condition broken. The respondents, the Commonwealth, the city of Boston, and the transit department, on this branch of the case, contend in substance that the Atlantic Avenue location was granted upon an implied condition that it should be used for the purpose for which it was

granted; that the provisions in St. 1897, c. 500, against revocation of the location do not preclude enforcement of forfeiture of the location for breach of this implied condition; that on the facts appearing in the record this implied condition has been broken; that St. 1939, c. 482, § 1, constitutes a declaration of such forfeiture, subject to judicial review; and that on such review in this proceeding this declaration of forfeiture must be sustained as valid.

1. Statute 1939, c. 482, clearly discloses a legislative purpose that the Atlantic Avenue location be terminated. Apparently it was the legislative purpose that such location should be terminated either by "revocation," in the sense in which that word is ordinarily used in relation to street railway locations, or by "forfeiture" for condition broken, whichever method can be given effect within the limitations of the State and Federal Constitutions. The word "revocation" is sometimes used in the sense of a "declaration of forfeiture" (see *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 194, 195), but, as ordinarily understood, there is a fundamental difference between "revocation" or repeal and "forfeiture" or cancellation for condition broken. This distinction was pointed out in *Public Service Commission of Puerto Rico* v. *Havemeyer*, 296 U. S. 506, 517, where it was said that the "reserved power to repeal a grant of special privileges implies that it may be exerted at the pleasure of the legislature or other authority in which the power to repeal is vested. . . . That power is plainly distinguishable from the power to cancel for violation of the terms of the grant. In the absence of constitutional, legislative or contractual restriction, the exertion of the first mentioned power requires nothing more than an appropriate declaration of the repeal. . . . But, without consent of the holder, valid cancellation for condition broken cannot be accomplished without giving to the holder an opportunity to have the asserted default judicially determined." Though the statutory provisions relating to "revocation" and those relating to "forfeiture" are in form somewhat interwoven, in their nature they are separable within the "well settled

principle of constitutional law that one part of a statute may be contrary to the Constitution, while the rest may stand as valid, provided the two parts are distinct and in their nature separable the one from the other and are not so interwoven and mutually dependent as to require the belief that the Legislature would not have enacted the one without the other." *Ashley* v. *Three Justices of the Superior Court*, 228 Mass. 63, 81, and cases cited. Clearly there is nothing in the statute to require the belief that the Legislature would not have enacted the declaration of forfeiture without the revocation if it had regarded the latter as unconstitutional, as we now hold. Neither provision is dependent upon the other. We proceed, therefore, to consider the case on the ground of forfeiture of the Atlantic Avenue location for condition broken, as declared by the Legislature in said St. 1939, c. 482.

2. As appears from the statement above quoted from *Public Service Commission of Puerto Rico* v. *Havemeyer*, 296 U. S. 506, 517, the question whether there has been a forfeiture of the Atlantic Avenue location for breach of a condition of the grant of such location is for judicial determination upon the facts and not for legislative determination. This principle was stated in *Opinion of the Justices*, 237 Mass. 619, 623, with respect to an act of incorporation then under consideration that constituted a contract, and what was there said is applicable to the grant of the Atlantic Avenue location, which we hold to be a contract. It was there said: "The decision of the question whether a charter has been so misused that it ought to be forfeited or suspended is judicial and not legislative or governmental in its nature. . . . Since the act of incorporation of the society constituted a contract, it is not a legislative function to determine whether that contract has been broken. Such action would be the taking of property without due process of law. . . . That is a question which under art. 30 of the Declaration of Rights of the Constitution of the Commonwealth can be decided only by the courts. . . . The act of incorporation having been a compact between the Commonwealth and the society, the question whether the latter has complied with

the conditions, obligations and duties resting on it is one for judicial cognizance. The society has a constitutional right to have its alleged misuse or violation of its charter determined by the courts. A forfeiture of the franchise to be a corporation (in the absence of express reservation of that power to the General Court as a limitation of the charter) can be effected against the protest of the corporation only by a judgment of a court of competent jurisdiction on a proceeding in behalf of the State." See cases therein cited. And see *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 195; *New York Electric Lines Co.* v. *Gaynor*, 218 N. Y. 417, 421; *People* v. *Public Service Commission*, 255 N. Y. 232, 240–241.

It does not follow, however, that in the matter of a forfeiture for condition broken there is no scope for legislative action. The ordinary procedure for enforcing such a forfeiture is by a proceeding in the nature of quo warranto brought by or in behalf of the Commonwealth. *Commonwealth* v. *Tenth Massachusetts Turnpike Corp.* 11 Cush. 171. See also *Commonwealth* v. *Union Fire & Marine Ins. Co.* 5 Mass. 230; *Attorney General* v. *Tudor Ice Co.* 104 Mass. 239; *Campbell* v. *Talbot*, 132 Mass. 174, 177; *Attorney General* v. *Adonai Shomo Corp.* 167 Mass. 424; *Attorney General* v. *Preferred Mercantile Co. of Boston*, 187 Mass. 516, 521; *Attorney General* v. *New York, New Haven & Hartford Railroad*, 197 Mass. 194. The Legislature, however, may prescribe a different procedure for a judicial determination whether there has been a forfeiture of the privilege granted. Upon this point the Supreme Court of the United States in *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 195, said, speaking with respect to municipal permission to use the streets, that whether "the State shall proceed directly by quo warranto, or whether it shall authorize the municipality to pass a resolution or ordinance of repeal or revocation leaving the propriety of its course to be determined in an appropriate legal proceeding in which the default of the grantee may be adjudicated, is a question of state law with which we are not concerned. The resolution in such case serves to define the attitude of the public

authorities, and to revoke the permission where sufficient ground exists for such revocation. Whether there has been such a mis-use or non-exercise of the franchise as to warrant its withdrawal is a matter for judicial consideration." It is obvious that this language — though the word "revocation" is used, and action by a municipality is referred to — is applicable to a declaration by the Legislature of forfeiture of a grant for breach of a condition thereof. And it was said of a similar privilege in *Public Service Commission of Puerto Rico* v. *Havemeyer*, 296 U. S. 506, 515: "It may be canceled or withdrawn by any procedure that is not repugnant to the established principles of justice. The initial step need not be a suit for mandamus, quo warranto, injunction or the like. Essential requirements are satisfied if the withdrawal of the privilege, declared by legislative or executive authority, may be followed by appeal to a court of competent jurisdiction in which the rights of the holders may be determined." The present proceeding is authorized by State law, and the company makes no contention that this is not a proper proceeding in which the issue may be judicially determined whether there is "just cause" of forfeiture, on the ground of breach of a condition of the grant, of the Atlantic Avenue location. Moreover, a breach of a condition of a grant, though constituting a ground of forfeiture of the granted privilege, may — subject to constitutional limitation — be waived by the State acting by its Legislature. *Commonwealth* v. *Union Fire & Marine Ins. Co.* 5 Mass. 230, 231–232. *Commonwealth* v. *Tenth Massachusetts Turnpike Corp.* 11 Cush. 171, 176–178. See also *Arlington Board of Survey* v. *Bay State Street Railway*, 224 Mass. 463, 471. The declaration of forfeiture in St. 1939, c. 482, "serves to define the attitude" of the Commonwealth by negativing waiver of the asserted breach and insisting upon forfeiture of the Atlantic Avenue location by reason of such breach.

3. Conditions, express or implied, in a grant by the State of a franchise or privilege are in the nature of conditions subsequent and the State making such a grant may, by proper proceedings, as here, terminate the franchise or

privilege if a material condition of the grant has been broken. *Commonwealth* v. *Tenth Massachusetts Turnpike Corp.* 11 Cush. 171. See also *Commonwealth* v. *Union Fire & Marine Ins. Co.* 5 Mass. 230, 231; *Treasurer & Receiver General* v. *Revere Sugar Refinery*, 247 Mass. 483, 490. As was said in *Public Service Commission of Puerto Rico* v. *Havemeyer*, 296 U. S. 506, 515, "Every such special privilege is subject to termination for breach of condition, whether express or implied, upon which the grant depends." See also *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 195. Indeed, the company does not attempt to controvert this general principle. Such a termination of a granted franchise or privilege in accordance with a condition of the grant cannot be regarded as impairing the obligation of a contract, *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 195, nor as depriving the grantee of its property without due process of law or taking its property without compensation within the meaning of the constitutional prohibition.

4. Upon this petition in equity this court must decide the mixed question of fact and law, whether on the facts agreed and the proper inferences therefrom there has been a breach of a material condition of the grant of the Atlantic Avenue location that constitutes "just cause" — that is "a cause sufficient in law," *Higgins* v. *License Commissioners of Quincy*, 308 Mass. 142, 144 — for forfeiture of this location, where, as here, the forfeiture is insisted upon by the Commonwealth.

5. No contention is made that there has been a breach of any express condition of the grant of the Atlantic Avenue location. Reliance is placed solely on breach of an implied condition of such grant that the location should continue to be used for the purpose for which it was granted. With respect to such an implied condition of a grant it was said in *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 194, that "while the grant becomes effective when made and accepted in accordance with the statute and the grantee is thus protected in starting the enterprise, it has always been recognized that, as the franchise

is given in order that it may be exercised for the public benefit, the failure to exercise it as contemplated is ground for revocation or withdrawal. . . . It is a tacit condition annexed to grants of franchises that they may be lost by mis-user or non-user. . . . The condition thus implied is, of course, a condition subsequent." Such a condition was referred to as a "condition which inheres in the nature of the grant." Page 195. And it was said in *Public Service Commission of Puerto Rico* v. *Havemeyer,* 296 U. S. 506, 515, "Implied in every grant of franchise is the condition that it may be lost by misuse." In accordance with these general principles, the grant of the Atlantic Avenue location would clearly be subject to an implied condition that it should continue to be used for the purpose for which it was granted — apart at least from the contract against revocation of location. Indeed, the question whether there was such an implied condition would be largely theoretical, apart from the contract against revocation, in view of the broad power of revocation of a street railway location at the pleasure of the Legislature. The Commonwealth in granting the Atlantic Avenue location clearly was not conveying property that it held as a private owner to the company to be held by it as a private owner. The Commonwealth was dealing with public streets. The nature of the power exercised by the Legislature in granting the location and the nature of the location have been discussed fully earlier in this opinion. It is enough to say here that in granting the Atlantic Avenue location the Legislature, as in the case of a grant of an ordinary street railway location, was regulating the use of the streets by granting to the company a special privilege to "use the public ways . . . for the purpose of facilitating public travel and accommodation." *Springfield* v. *Springfield Street Railway,* 182 Mass. 41, 48. It was a "peculiar privilege to modify to some extent the use of the public way, and by such modifications to enjoy in common with others the easement of public travel [irrespective of whether the public right is technically an easement or a fee in the streets], according to the limitations and advantages which accrue from the

employment of rails and cars," and of an elevated structure. See *Sawin* v. *Connecticut Valley Street Railway*, 213 Mass. 103, 107. The privilege was granted to the company to be exercised for the benefit of the public. See *Weld* v. *Gas & Electric Light Commissioners*, 197 Mass. 556, 557; *Assessors of Quincy* v. *Boston Consolidated Gas Co.* 309 Mass. 60, 65, and cases cited. The fact that the privilege granted is to employ an elevated structure does not change its basic character. The general purpose of the grant is the same as if a more usual means of travel were to be employed. A condition that the Atlantic Avenue location shall continue to be used for the purpose of the grant "inheres in the nature of the grant" unless negatived by the contract against revocation.

6. The fact, however, that the grant of the Atlantic Avenue location was by contract irrevocable does not change its general purpose or its fundamental nature. This contract against revocation cannot, in our opinion, rightly be interpreted as including a contract that the location shall not be terminated for breach of a material condition of the grant. A "grant from the sovereign power is to be construed strictly against the grantee. Nothing will be included in the grant except what is granted expressly or by clear implication." *Attorney General* v. *Jamaica Pond Aqueduct Corp.* 133 Mass. 361, 365–366. *Stoneham* v. *Commonwealth*, 249 Mass. 112, 117. See also *Cleaveland* v. *Norton*, 6 Cush. 380, 383–384. In the case last cited it was said that "one who claims a franchise or exclusive privilege, in derogation of the common rights of the public, must prove his title thereto by a grant clearly and definitely expressed, and cannot enlarge it, by equivocal or doubtful provisions, or mere probable inferences." Page 383. And see *Cleveland Electric Railway* v. *Cleveland & Forest City Railway*, 204 U. S. 116, 129–130. This principle of construction is applicable even though the grant constitutes a contract between the Commonwealth and the grantee. See *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 666, 667.

An intention on the part of the Legislature to grant to

the company a privilege, without limit of time, to occupy the streets with an elevated structure, such as is described in the agreed facts and is familiar as a matter of common knowledge, without use of such elevated structure for the purpose for which the location was granted, is not lightly to be inferred. And the statute by which the Atlantic Avenue location was granted (St. 1894, c. 548, amended and extended by St. 1897, c. 500) made no provision for this contingency, apparently leaving it to be dealt with in accordance with common law principles. Express provision, however, was made that the statute conferring powers on local authorities with respect to the alteration and revocation of street railway locations should not apply to locations granted to the company for an elevated railroad. St. 1897, c. 500, § 21. Obviously this provision does not preclude enforcement by the Commonwealth of a forfeiture of such a location for condition broken. Two other provisions of the statute deal with the revocation of locations. St. 1897, c. 500, § 19. One of these provisions expressly reserved to the Legislature the right to revoke locations for failure of the company to construct its railroad thereon within a stated period. The apparent purpose of this provision was to fix definitely the period within which the company should construct its railroad on a granted location and to make the grant subject to revocation at the pleasure of the Legislature if the railroad was not completed thereon within that period, so as to leave no uncertainty as to when failure to construct the railroad would subject the company to loss of the location by reason of such failure. It is not to be inferred that in the absence of such a provision there would not have been an implied condition that the company should construct the railroad upon a granted location, breach of which would subject the company to forfeiture of such location. Nor is it to be inferred from the inclusion of such a provision in the statute that there was not an implied condition that a railroad constructed on a granted location should be used for the purpose for which the location was granted. In view of the difficulty of stating this condition in definite

terms as applied to all possible future circumstances, it was not unnatural to leave it to implication in accordance with common law principles. The maxim, *Expressio unius est exclusio alterius*, does not apply. Compare *Commonwealth* v. *Berkshire Life Ins. Co.* 98 Mass. 25, 29. The existence of such an implied condition is not negatived by the provision in question.

Nor is the existence of an implied condition that a granted location should be used for the purpose for which it was granted negatived by the other statutory provision in § 19 that the locations granted to the company "shall not be subject to revocation" except in accordance with certain statutes providing for taking by eminent domain or purchase, under which the company would receive compensation for a location so revoked. This restriction, imposed by the Legislature by contract, upon itself and succeeding legislatures, acting directly or indirectly, construed strictly against the company — the grantee — is a restriction upon the power of the Legislature to revoke at its pleasure locations granted to the company — a power that, in accordance with the decisions relating to ordinary street railway locations (*Boston, Worcester & New York Street Railway* v. *Commonwealth*, 301 Mass. 283, and cases cited), the Legislature would have had apart from this contractual restriction. As pointed out earlier in this opinion, the Legislature, by reason of this restriction, could not revoke such a location at its pleasure without payment of compensation, and St. 1939, c. 482, cannot take effect as a revocation of the Atlantic Avenue location. But the inference is not to be drawn from this restriction upon the power of the Legislature that the company is entitled to retain its granted locations without using them for the purpose for which they were granted. The condition ordinarily implied in a grant of a special privilege, that such privilege shall be used for the purpose for which it was granted, is to be implied notwithstanding the restriction upon the power of the Legislature to revoke the grant thereof at its pleasure. And the general principle that a material breach of such an implied condition in a grant is a ground of forfeiture remains appli-

cable. The contractual provision against revocation embodied in the statute granting the Atlantic Avenue location cannot be invoked effectively to protect the grantee from the consequences of its own failure to use such location for the purpose for which it was granted — if there has been such a failure.

7. The facts that the Atlantic Avenue structure has cost the company a large amount of money, and that, doubtless, a large expenditure by the company for this purpose was contemplated by the statute by which the Atlantic Avenue location was granted, do not preclude the implication of a condition that such location was to be used for the purpose for which the location was granted. Nor do these facts preclude the enforcement of a forfeiture of the location if there has been a material breach of this implied condition. This condition, though implied and not express, was a part of the contract between the Commonwealth and the company, limiting the obligation of the Commonwealth thereunder. Considerations of hardship resulting from the enforcement of this condition cannot be invoked to prevent such enforcement when insisted on by the Commonwealth. See *Commonwealth* v. *Tenth Massachusetts Turnpike Corp.* 11 Cush. 171, 175–176; *Columbus* v. *Mercantile Trust & Deposit Co. of Baltimore,* 218 U. S. 645, 663. The hardship resulting from forfeiture of the Atlantic Avenue location for condition broken is comparable to that resulting to a street railway company from a revocation of an ordinary street railway location by the Legislature or by its authority. Yet such hardship does not preclude revocation without compensation. See *Boston, Worcester & New York Street Railway* v. *Commonwealth,* 301 Mass. 283, 284–286, and cases cited.

The large expenditure of the company in connection with the Atlantic Avenue location for damages on account of the additional servitude created or declared by St. 1894, c. 548, § 8 (considered in connection with St. 1897, c. 500) resulting from the "location, construction, maintenance or operation" of the company's lines of railway "in any public or private way" stands on the same footing as expenditures of the

company for construction of the Atlantic Avenue structure. Whatever may be the nature of the rights acquired by the company against private persons by reason of the payment of such damages, or of the taking of property for which such damages were compensation (see *Baker* v. *Boston Elevated Railway*, 183 Mass. 178; *Bates* v. *Boston Elevated Railway*, 187 Mass. 328), as against the Commonwealth the rights of the company so acquired were incidental to the location. And the Commonwealth is not precluded from insisting upon a forfeiture of the Atlantic Avenue location for condition broken by reason of the acquisition by the company at large expense of these rights against private persons. The technical effect of a forfeiture of the location upon the rights so acquired by the company against private persons need not be considered. The practical effect apparently will be to relieve such persons of the burden of a servitude for which they have been paid. But this result does not prevent enforcement by the Commonwealth of a forfeiture of the location. The inclusion in the statutes dealing with locations for the company's elevated railway of this provision relating to an additional servitude does not negative the implication of a condition that the Atlantic Avenue location should be used for the purpose for which it was granted, breach of which condition would be a ground of forfeiture. Nor do the facts that a part of the Atlantic Avenue location granted to the company by St. 1894, c. 548, § 6, amended by St. 1897, c. 500, § 3, was therein described as "in part upon and over private lands," and that a part of the Atlantic Avenue structure was constructed upon such lands, affect the right of the Commonwealth to insist upon a forfeiture of the Atlantic Avenue location for condition broken, whatever effect such a forfeiture may have upon the rights of the company in such private lands. See *Connecticut Valley Street Railway* v. *Northampton*, 213 Mass. 54, 64.

8. The company in support of its case that there has been no forfeiture of the Atlantic Avenue location makes these contentions: (a) that no "condition of continuous operation of passenger service" can be implied, (b) that if any such condition be implied it has not been broken, and (c) that

if any such condition be implied "it has been waived by the Commonwealth during the period of public control." The last of these contentions may also be stated as a contention that the breach of condition, if there would have been any in other circumstances, was brought about by the Commonwealth and not by the company, and therefore, in the circumstances here appearing, either it is not a breach of the condition or, if it is a breach, it cannot be taken advantage of by the Commonwealth as a ground of forfeiture of the Atlantic Avenue location.

9. The contention of the company that no "condition of continuous operation of passenger service" can be implied is based almost entirely on the ground, already considered, that there is no implied condition that the Atlantic Avenue location be used for the purpose for which it was granted. We hold, for the reasons stated, that there was such an implied condition. Whether this implied condition includes a "condition of continuous operation of passenger service" can best be considered in connection with the question whether there has been a breach of the implied condition that the Atlantic Avenue location be used for the purpose for which it was granted. We do not attempt to define precisely the limits of this implied condition, but merely decide whether on the facts found and proper inferences therefrom there has been a breach of this condition. And we consider this matter in the first instance on the basis that the acts of the board of trustees of the company under Spec. St. 1918, c. 159, as revised and extended by St. 1931, c. 333 — herein referred to as "Public Trustees" — were in all material respects the acts of the company.

Statute 1939, c. 482, was passed on August 12, 1939, and took effect upon its passage. There had been no physical severance of the Atlantic Avenue structure from the rest of the company's system of elevated railways. But since the previous October 1 (1938) "no elevated railway trains . . . [had] been operated for any purpose over said Atlantic Avenue Section," meaning the Atlantic Avenue location and the structure thereon. However, certain "electric cables and air pipe lines on said Atlantic Avenue elevated

structure have been used continuously since October 1, 1938, for the transmission of electricity and compressed air for use in connection with the operation of other parts of the Company's railway operations." These electric cables and air pipe lines and the purposes served by the electricity and the compressed air transmitted thereby are described in detail in the agreed facts. It is clearly a proper inference that electricity and compressed air are essential to the company's railway operations. The agreed facts show, however, that such electricity and compressed air could be supplied by means not involving the use of the Atlantic Avenue location or the Atlantic Avenue structure although the cost of providing such other means would aggregate $93,575. The agreed facts show no other use of the Atlantic Avenue location or the structure thereon during the period between October 1, 1938, and August 12, 1939, and we infer that there was none.

The purpose for which the Atlantic Avenue location was granted to the company was clearly the transportation of passengers. The company's "chief corporate purpose is to afford carriage of passengers for hire." *Opinion of the Justices,* 261 Mass. 556, 594. It was authorized to "construct lines of elevated railway" upon certain locations including the Atlantic Avenue location, and to "equip, maintain and operate engines, motors and cars" thereon. St. 1894, c. 548, § 6, as amended by St. 1897, c. 500, §§ 2, 3. Doubtless the grant of such a location contemplated its use for purposes incidental to transportation of passengers on the location and perhaps to some extent for purposes incidental to transportation of passengers on other parts of the company's system of railways considered as a unit. But the primary purpose of the grant of such a location obviously was to provide for transportation over the location itself. In this respect the location resembles an ordinary street railway location, which is in the nature of a privilege "to enjoy in common with others the easement of public travel." *Sawin* v. *Connecticut Valley Street Railway,* 213 Mass. 103, 107. It would require clear language in the grant of a location to show an intention on the part

of the Legislature to grant to the company the privilege of occupying public streets in the city of Boston for a distance of more than two miles with a structure of the nature of the Atlantic Avenue structure for the purpose to which it was devoted from October 1, 1938, to August 12, 1939. We conclude, therefore, that the use made of the Atlantic Avenue location by the company during this period was not a use for the purpose for which the location was granted. And the Commonwealth has not consented, unless by the acts of the Public Trustees — the effect of which is hereinafter considered — to a use of the location for a different purpose from that contemplated by the original grant of the location. Compare *Chase* v. *Sutton Manuf. Co.* 4 Cush. 152, 169.

It remains, however, to consider whether the use of the Atlantic Avenue location by the company in the manner described was of such duration as to be a material breach of the implied condition of the grant of the location that it be used for the purpose for which it was granted, constituting a ground of forfeiture of the location. The question involved is to be distinguished from the question of abandonment of an easement or other interest in land, where intention to abandon is an important factor. See *Willets* v. *Langhaar*, 212 Mass. 573, 575; *New York Central & Hudson River Railroad* v. *Chelsea*, 213 Mass. 40, 45; *Boston & Albany Railroad* v. *Reardon*, 226 Mass. 286, 292; *Dubinsky* v. *Cama*, 261 Mass. 47, 57; *Williams* v. *Atlantic Coast Line Railroad*, 17 Fed. (2d) 17, 22. In such cases it has been said that abandonment is not to be inferred from mere nonuser. Here, however, the question arises between the Commonwealth, the grantor of this location, and the company, the grantee, and is whether the grantee has failed to perform a condition of the grant. Whether or not the grantee intended to abandon the location is not decisive if, in fact, such grantee has not performed the condition.

For a period of more than ten months prior to the declaration of forfeiture by the Legislature the company failed to use the location for the purpose for which it was granted.

And there is nothing in the agreed facts tending to show that such failure was temporary in nature by reason of any emergency, reconstruction or other special circumstance. On the contrary, the matter of discontinuing passenger service on the Atlantic Avenue location had been under consideration by the Public Trustees of the company for several months prior to a vote by them on September 21, 1938, authorizing the president and general manager of the company "to discontinue passenger service on the Atlantic Avenue elevated structure commencing October 1, 1938." Nothing was stated in this vote as to the period of discontinuance. Nor was anything stated therein as to the reason for the discontinuance of such service. But it appears from the agreed facts that the Public Trustees in adopting the vote had before them, in a report of the president and general manager of the company, the facts that in a period of fifteen years the annual revenue collected at the stations on the Atlantic Avenue structure had decreased from $522,961.28 to $180,854.18, that the passenger traffic thereon could be adequately taken care of by the company in other ways, and that there would be an estimated net saving in the cost of service of the company "of approximately $140,000 per year resulting from discontinuance of passenger train service" on the Atlantic Avenue structure. It is the proper inference from the vote of the Public Trustees of the company to discontinue passenger service on the Atlantic Avenue structure commencing October 1, 1938, in view of the ground upon which obviously it was based, and from the actual failure of the company to furnish such service for more than ten months from October 1, 1938, to the date of the declaration of forfeiture, that such failure was in no real sense temporary, but rather was permanent, or at least indefinite in time, and that, whether or not abandonment of the location itself was intended, there was actual abandonment for an indefinite period of the use of such location for the purpose for which it was granted. We give no weight to the fact, appearing in the "stipulation of agreed facts" filed more than seven months after the

date of the declaration of forfeiture, that during this period the company continued to use the Atlantic Avenue location in the same manner as during the period of more than ten months from October 1, 1938, to the date of such declaration, as bearing on the temporary or permanent nature of the company's use of the location as herein described. Clearly, however, this fact has no tendency to show that such use was merely temporary. Though the period prior to the date of the declaration of forfeiture during which the Atlantic Avenue location was not used for the purpose for which such location was granted was somewhat shorter than such periods in similar cases where it was held that granted privileges were forfeited (see, for example, *State* v. *East Fifth Street Railway*, 140 Mo. 539; *Stillwater* v. *Hudson Valley Railway*, 255 N. Y. 144, 149), we conclude that, in the circumstances of this case, the period of failure of the company to use the Atlantic Avenue location according to the condition of the grant was long enough to constitute a material breach of such condition.

The Atlantic Avenue structure has not been physically severed from the other parts of the company's system of railways. It is apparent, however, from the facts agreed, that neither the Atlantic Avenue location nor the structure thereon constitutes such an integral part of the company's system that the loss of the location by the company will substantially interfere with the operation of the rest of the system, except as it will require the substitution of other means for transmission of electricity and compressed air. The incidental use of the location and the structure for this purpose, as already pointed out, does not entitle the company, under the condition of the grant thereof, to retain the location. The company urges, however, that the structure is capable of being used at short notice as an alternative route if operation through the Washington Street tunnel should be interrupted, that the company's right to operate through that tunnel is only by virtue of a lease which may terminate on July 1, 1962, and that if such lease were terminated the company would be without facilities for through operation of rapid transit trains except upon the Atlantic

Avenue structure.   The company urges further that circumstances may change so as to render the use of the Atlantic Avenue structure an important and necessary element in furnishing rapid transit service to the community.   These contingencies are entitled to consideration, yet we think that the grant of the Atlantic Avenue location is within the principle stated in *New York Electric Lines Co.* v. *Empire City Subway Co.* 235 U. S. 179, 194 — though the facts in that case were less favorable to the grantee than the facts in this case — that the "conception of the permission as giving rise to a right of property in no way involves the notion that the exercise of the franchise may be held in abeyance for an indefinite time, and that the right may thus be treated as a permanent lien upon the public streets, to be enforced for the advantage of the owner at any time, however distant." *Stillwater* v. *Hudson Valley Railway*, 255 N. Y. 144, 150.   In view of the nature of the grant of the location as primarily a regulation of the use of the streets modifying in a substantial manner the use of the streets by the public generally, we conclude that the retention of the location by the company for an indefinite time to meet the contingencies suggested would not constitute a use of such location for the purpose for which it was granted.

It follows from what has been said — and we so find — that there has been a material breach of the implied condition of the grant of the Atlantic Avenue location that it be used for the purpose for which it was granted — provided the acts of the Public Trustees with respect to the use thereof are to be regarded as the acts of the company.

10. Though the failure of the company to use the Atlantic Avenue location resulted from the acts of the Public Trustees in the management and operation of the company, it none the less constituted a breach of the implied condition that the location be used for the purpose for which it was granted.

The use of the Atlantic Avenue location and the structure thereon by them in the manner herein described was within the authority conferred upon the Public Trustees by the so called Public Control Act, Spec. St. 1918, c. 159, as amended

and extended by St. 1931, c. 333, which in respect to the matter of the authority of such trustees here involved constituted a contract between the company and the Commonwealth. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 413, 415–416; *S. C. sub nomine Boston* v. *Jackson*, 260 U. S. 309. See also *Opinion of the Justices*, 261 Mass. 523, 551–553; 309 Mass. 609, 620–621. Such use, having been authorized by the company, is to be regarded as its own act.

This contract between the company and the Commonwealth provided for what is described in the Public Control Act as "public management and operation of the railway system" of the company (Spec. St. 1918, c. 159, §§ 1, 12), or more broadly as management and operation or management of the "company." Spec. St. 1918, c. 159, §§ 1, 2. St. 1931, c. 333, § 1. See also Spec. St. 1918, c. 159, §§ 3, 13, 15, 16; St. 1931, c. 333, §§ 3, 17, 19. The period of "public management and operation" was fixed by Spec. St. 1918, c. 159, §§ 1, 12, at ten years from the date of assumption of such management by the trustees and, thereafter, "until such time as the commonwealth shall elect to discontinue such public management and operation" in a manner therein prescribed, and by St. 1931, c. 333, § 1, was extended until July 1, 1959, "and thereafter, unless terminated on said date or thereafter" in the manner prescribed by Spec. St. 1918, c. 159, § 12. See *Opinion of the Justices*, 309 Mass. 609, 615. The contract between the company and the Commonwealth created by the Public Control Act and acceptance thereof by the company has been described as "in its essential features a lease of the railway property to the Commonwealth, or at least a contract for public operation upon stipulated terms . . . A street railway system was turned over for public management in return for the provisions made in the statute for the benefit of the owner. All those provisions, including that for rehabilitation of the railway property, are in the nature of compensation to be made for the use of the property." *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 415–417. See *Opinion of the Justices*, 261 Mass. 523, 551; 309 Mass. 609, 620–621. See also *Helvering* v. *Powers*, 293 U. S. 214, 222–223. Major

elements of such compensation are the payment of dividends on the stock of the company even though the income of the company is insufficient for the purpose (Spec. St. 1918, c. 159, §§ 6, 8, 9, 11 as amended by St. 1935, c. 99, § 1; St. 1931, c. 333, § 2), and the maintenance of the "property of the company in good operating condition" with "such provision for depreciation, obsolescence and rehabilitation, that, upon the expiration of the period of public management and operation, the property shall be in good operating condition." Upon the expiration of that period "control of the property shall then revert to the company" and the amount originally paid by the company to constitute a reserve fund, under Spec. St. 1918, c. 159, § 5, be returned to the company. Spec. St. 1918, c. 159, § 13. See *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 410–411.

Undoubtedly the management and operation of the company's railways by the Public Trustees under the Public Control Act are for a public purpose. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 412–414; *S. C. sub nomine Boston* v. *Jackson*, 260 U. S. 309, 314–316. *Chelsea* v. *Treasurer & Receiver General*, 237 Mass. 422, 429. *Helvering* v. *Powers*, 293 U. S. 214, 222. See also *Opinion of the Justices*, 231 Mass. 603, 608–609; 261 Mass. 523, 541–543; 261 Mass. 556, 594. And such management and operation are carried on by the Public Trustees in behalf of the Commonwealth, which contracted with the company for such management and operation upon certain specified terms and conditions. Spec. St. 1918, c. 159, § 18. St. 1931, c. 333, § 19. Moreover, it is provided expressly by the Public Control Act that the Public Trustees "shall take and have possession of said properties [the "properties owned, leased or operated" by the company] in behalf of the commonwealth during the period of public operation." Spec. St. 1918, c. 159, § 2. The Public Trustees are appointed by the Governor with the advice and consent of the Council. Spec. St. 1918, c. 159, § 1. In *Opinion of the Justices*, 261 Mass. 523, 542–543, the Justices, in speaking of Spec. St. 1918, c. 159, as amended by a proposed bill that would not affect the statement here quoted, said that under said c. 159 as so amended the com-

pany, "although privately owned, will not be privately managed. On the contrary, it is to be managed, controlled and operated wholly by the board of trustees who are appointed by the Governor, who constitute a public board, who are for all essential purposes public officers although under said c. 159, § 2, 'deemed to be acting as agents of the company and not of the commonwealth,' and whose duties are prescribed by a public statute enacted by the General Court pursuant to its constitutional prerogatives." Certain specific provisions of the chapter were said to have no bearing upon the character of the services of the trustees as public officers. And it was said further that the "entire responsibility of management and operation rests upon the trustees as public officers." No reason appears upon reexamination (*Keenan, petitioner, ante,* 166, 172) to modify this statement. *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 412. *Opinion of the Justices,* 261 Mass. 523, 550. *Helvering* v. *Powers,* 293 U. S. 214.

The Legislature, however, did not purport by the Public Control Act to take or to authorize the taking of possession of the properties of the company or the subsequent management and operation thereof by virtue of any sovereign power other than the power to enter into a contract with the company for the carrying out of a public purpose. There was "no inexorable mandate that such public operation be undertaken." *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 412–413. The Public Trustees, as public officers, have statutory powers and duties under the Public Control Act for the carrying out of its public purpose. But, within the scope of these statutory powers, the powers of the trustees to take and have possession of the properties of the company and to manage and operate these properties are derived from the contract of the company with the Commonwealth that permits the trustees to deal in this manner with the properties of the company. Apart from this contract the trustees would have no such powers with respect to these properties. But no question is involved here as to any difference in the scope of the statutory powers of the trustees and their contractual powers to deal

with these properties. These powers of the Public Trustees are described in the Public Control Act in the same terms — indeed in the same provisions of the act. Nor is any question involved here as to the right of the Commonwealth to substitute by statute, without agreement by the company, other public officers to exercise the powers derived from the contract between the company and the Commonwealth. In other words, it is unnecessary to determine precisely the extent to which the provisions of the Public Control Act are to be construed as a contract, since the provisions thereof here involved, as applied to the facts of this case, are to be so construed. See Spec. St. 1918, c. 159, § 18; St. 1931, c. 333, § 19. In form, however, the contractual powers relating to the management and operation of the company's properties are conferred upon the Public Trustees. Spec. St. 1918, c. 159, §§ 2, 3, 4, 6, 7, 10. St. 1931, c. 333, § 22. And Spec. St. 1918, c. 159, § 18, in describing the provisions of the Public Control Act that are not to be construed as a contract binding on the Commonwealth, leaves among the provisions that are to be construed as constituting such a contract the provisions "which define the terms and conditions under which, during the period of public management and operation, the property owned, leased or operated by the Boston Elevated Railway Company shall be managed and operated by the said trustees." A similar provision is contained in St. 1931, c. 333, § 19. So far, therefore, as the Public Trustees, though acting under statutory authority as public officers for the carrying out of a public purpose, exercise powers derived from the company by reason of its contract with the Commonwealth, they act by authority of the company and in its behalf, and their acts, within the scope of such authority, are binding upon the company and are to be regarded as the acts of the company.

The conclusion here reached is in accord with the fundamental nature of the enterprise carried on by the Commonwealth under the Public Control Act. The purpose of the enterprise is none the less public by reason of the authority of the Public Trustees to act in behalf of the

company. And the enterprise is none the less carried on by public officers because the Public Trustees have the powers of the company with respect to the management and operation of its properties and act through the medium of the company. The company retains its corporate existence during the period of public management and control. It continues to be the owner of the properties or rights therein. But the Public Trustees are directed to "manage and operate the Boston Elevated Railway Company hereinafter called the company" as well as "the properties owned, leased or operated by it." Spec. St. 1918, c. 159, § 2. St. 1931, c. 333, § 1. Accordingly, it is provided that for the purposes of the act, except as otherwise provided therein, the trustees "have and may exercise all the rights and powers of said company and its directors, and, upon behalf of said company, shall receive and disburse its income and funds," and they are given "the right to appoint and remove in their discretion the president, treasurer and clerk of the corporation, and all officers of the company other than the board of directors." The board of directors is left with limited powers, its duties "during the period of public operation" being "confined to maintaining the corporate organization, protecting the interests of the corporation so far as necessary, and taking such action from time to time as may be deemed expedient in cases, if any, where the trustees cannot act in its place." Such board during this period, however, shall "have no control over the management and operation of the street railway system." With the exceptions stated the trustees, instead of the directors, act for the company. And they even act for the company in some matters ordinarily requiring action of the stockholders. Spec. St. 1918, c. 159, § 4. Moreover, the trustees have express authority within certain limitations "to make contracts in the name and on behalf of, and to issue stocks, bonds and other evidences of indebtedness of, the company." § 3. And the "income which may accrue from the property" while it is being managed and operated by the trustees "is in no sense public income, although restrictions are placed upon its

use . . . Profits which may accrue, save as thus restricted, belong to the railway company and not to the Commonwealth. Actions and suits for the recovery of obligations arising out of the public management must be brought by and against the railway company and not the Commonwealth." *Opinion of the Justices,* 261 Mass. 523, 550; 309 Mass. 609, 622–623. Furthermore, it is provided by the Public Control Act that in "the management and operation of the said company and of the properties owned, leased or operated by it, as authorized by this act, the trustees and their agents, servants and employees shall be deemed to be acting as agents of the company and not of the commonwealth, and the company shall be liable for their acts and negligence in such management and operation to the same extent as if they were in the immediate employ of the company, but said trustees shall not be personally liable." Spec. St. 1918, c. 159, § 2. See *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 419. This statutory provision does not prevent the trustees from being public officers. *Opinion of the Justices,* 261 Mass. 523, 542–543. There is no inconsistency between the trustees acting as public officers and at the same time exercising powers delegated to them by the company by contract with the Commonwealth, by the exercise of which the company is bound as by the acts of its agents. Without expressing any opinion as to the generality of the statutory provision just quoted, it is to be said at least that this provision is consistent with the other provisions of the Public Control Act constituting a contract between the company and the Commonwealth, interpreted as authorizing the trustees acting within the scope of such authority to bind the company by their acts.

It was within the scope of the authority of the Public Trustees derived from the contract of the company with the Commonwealth — and for like reasons within their statutory authority as public officers — to discontinue the use of the Atlantic Avenue location for the transportation of passengers thereon. The duty was charged upon the trustees, accompanied by a grant of power to perform that duty,

to manage and operate a large railway system considered as a unit. The purpose of charging them with this duty, as of the Public Control Act as a whole, was to provide for the transportation of passengers, by the use of the properties of the company, in the city of Boston and its suburbs, while conserving the private interests of the owners of the company. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 413–414. *Opinion of the Justices*, 261 Mass. 523, 541–542. It was contemplated that the "cost of the service," including, among other things, "operating expenses" and stipulated dividends upon the stock of the company, should be paid out of income derived from the operation of the railway system (Spec. St. 1918, c. 159, § 6; St. 1931, c. 333, § 2; *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 413; *Opinion of the Justices*, 231 Mass. 603, 607–608), but, if the income was insufficient for this purpose, the deficiency was to be paid out of money raised by taxation. Spec. St. 1918, c. 159, §§ 8, 9, 11 as amended by St. 1935, c. 99, § 1. *Opinion of the Justices*, 309 Mass. 609. Clearly it was intended that management and operation of the railway system should be economical so far as consistent with furnishing adequate service. Public management and operation were to continue for at least ten years under Spec. St. 1918, c. 159 (see §§ 1, 12), and for a period after the passage of St. 1931, c. 333 (see §§ 1, 24) of about twenty-eight years at the least. The Public Control Act as a whole, considered in the light of the circumstances in which it was passed, discloses an intention that facilities and service be improved during this period. The requirement of the act that the trustees "maintain the property of the company in good operating condition and . . . make . . . provision for depreciation, obsolescence and rehabilitation," while expressed as an element of the compensation of the company for the use of its property in order that the property may be "in good operating condition" when it reverts to the company at the end of the period of public management and operation (Spec. St. 1918, c. 159, § 13; *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 417), implies a purpose that this provision shall be made during this period for the present benefit of the public served

by the railway system. See also § 6. The Public Control Act discloses, even more clearly, an intention that during the rather long period of public management and operation the service and facilities of the railway system should be adapted to meet changing conditions with respect to the requirements of the public for transportation and with respect to the means of transportation. And the Public Control Act expressly empowered the Public Trustees to "determine the character and extent of the service and facilities to be furnished." Spec. St. 1918, c. 159, § 2. Clearly it was not within the public purpose of the Public Control Act that the passenger transportation system of Boston and its suburbs should remain static during the period of public management and operation. See *Adams* v. *Eastern Massachusetts Street Railway*, 257 Mass. 115.

It is not necessary to consider the extent to which the trustees could go in abandoning service on the company's railway system. But in the light of the purpose of the Public Control Act and the express provision thereof authorizing the trustees to "determine the character and extent of the service and facilities to be furnished," it must be inferred that they are not required to operate passenger service on all the railway properties of the company of the same character and extent as was being maintained when the trustees took possession of the properties. The trustees were not required to operate such service on all the company's locations — at least if, in the exercise of sound judgment, they decided that adequate service and facilities could be furnished in some other way within the provisions of the Public Control Act. This principle is applicable to the act of the trustees in discontinuing passenger service on the Atlantic Avenue structure, notwithstanding its extent and its cost to the company. The trustees did not exceed their powers in discontinuing passenger service on the Atlantic Avenue location and the structure thereon.

The company makes no contention that the trustees exceeded their powers in discontinuing passenger service on the Atlantic Avenue location, apart from the effect of such discontinuance upon the company's right to the

location. But the company contends, in substance, that the Public Trustees were not authorized by the contract between the company and the Commonwealth so to manage and operate the properties of the company that a forfeiture of this location would result. However, it can hardly be thought that the trustees were required to operate passenger service on the Atlantic Avenue location solely for the purpose of preserving the right of the company in the location. Such a limitation upon the powers of the trustees with respect to service and facilities was not contemplated by the Public Control Act.

Neither the Commonwealth nor the trustees acquired title to this location under the contract between the company and the Commonwealth. Such title remained in the company. The trustees, under the contract, merely took possession in behalf of the Commonwealth of the company's right in the location. *Boston* v. *Treasurer & Receiver General*, 237 Mass. 403, 419. That right, as already pointed out, was subject to an implied condition that such location be used for the purpose for which it was granted. It continued to be subject to that condition while in the possession of the trustees, unless waived by the Commonwealth. And, unless it was so waived, the action of the trustees in discontinuing passenger service thereon was a breach of the condition, since such service was discontinued by them by authority of the company, conferred upon them by its contract with the Commonwealth. We need not consider whether the loss of the Atlantic Avenue location and the structure thereon would fall within the provision of the Public Control Act authorizing the trustees to include in the cost of service allowances for losses in respect to property sold, destroyed or abandoned. Spec. St. 1918, c. 159, § 6. The company, however, apparently has no interest in this question since the burden of such an inclusion would fall upon income and, in case of a deficiency of income, on the taxpayers. The protection of the owners of the company lies in the fact that, at the expiration of the period of public management and operation, control of the property reverts to the company and

it must then be in "good operating condition." Spec. St. 1918, c. 159, § 13.  This provision obviously imports that control of the railway system as a unit shall revert to the company, but does not import that all the property of which the trustees originally took possession, in the form in which it then existed, shall so revert.  Such return of the property to the company, provision having been made for "depreciation, obsolescence and rehabilitation" thereof, was a part of the compensation received by the company for the use of its property by the trustees in accordance with the broad powers of management and operation thereof conferred upon them by the contract of the company with the Commonwealth.  The possibility of forfeiture of a location for failure to use it in accordance with an implied condition of the grant thereof is an incident of such authorized management and operation, as are other property losses.  Compliance with the provision for reversion to the company of control of its railway system will not be precluded by the forefeiture of the Atlantic Avenue location.  It cannot rightly be said that the location is such an essential part of the entire system that forfeiture thereof will have this effect.

As has been said already, the Commonwealth acting by the Legislature could have waived the implied condition of the grant of the Atlantic Avenue location that it be used for the purpose for which it was granted.  But the Commonwealth has not done so.  Such a waiver must be found, if at all, in the Public Control Act.  That act contains no express waiver of this condition.  And a waiver cannot be implied from the fact that under the act, and the contract between the company and the Commonwealth embodied therein, the Public Trustees have taken possession of the Atlantic Avenue location and the structure thereon with other properties of the company and are managing and operating these properties.  The condition that a granted location shall be used for the purpose for which it was granted is implied as an incident of the regulation of the use of the streets.  Such a location is a modification of the use of the streets by the public generally.

There is no greater reason for such modification of the use of the streets, by a location that is not being used for the purpose for which it was granted, while in the possession of public trustees than by such a location while in the possession of a railway company. It may be as important for the Commonwealth, in the interest of the public generally, to have the right to insist upon a forfeiture of a location in the possession of public trustees as of a location in the possession of a railway company. The acquisition under the Public Control Act by the Commonwealth of contractual rights with respect to the properties of the company is not a sufficient ground for the implication that the Commonwealth has waived a right previously acquired by it with respect of one of those properties. *Arlington Board of Survey* v. *Bay State Street Railway*, 224 Mass. 463, is not in conflict with this conclusion. The enforcement of a forfeiture of a location for breach of an implied condition that it be used for the purpose for which it was granted is not a punishment for wrongdoing. It is an assertion of a right of the Commonwealth to regulate the use of the streets for the public generally. The continued existence of a right of this nature, so far as such a right was implied in the original grant of the Atlantic Avenue location, is not inconsistent with the provisions of the Public Control Act. It is immaterial and need not be considered whether the same result could have been attained by abandonment by the Public Trustees of this location as by enforcement by the Commonwealth of a forfeiture thereof. Even if this were true, it would not follow by necessary implication that the Commonwealth had waived its right to act directly in the interest of the public using the streets.

11. We find that there has been a breach of the implied condition of the grant of the Atlantic Avenue location that it be used for the purpose for which it was granted. This breach is a ground for forfeiture of the location where, as here, such forfeiture is insisted on by the Commonwealth. Such forfeiture extends to the entire location described in St. 1939, c. 482, § 1, including such part thereof as is on privately owned land. So far as this location is

on privately owned land, it is incidental to the location in public streets and constitutes merely permission for the company to construct and maintain a part of its railway on such land in connection with that part of its railway that is in public streets. *Connecticut Valley Street Railway* v. *Northampton,* 213 Mass. 54, 62–63, 64. Since, so far as the public streets are concerned, the location is, in substance, a right to maintain and operate the Atlantic Avenue structure thereon, upon such forfeiture this structure becomes a nuisance (*Commonwealth* v. *King,* 13 Met. 115, 118–119; *Morton* v. *Moore,* 15 Gray, 573, 576) and the company may be required to abate the nuisance by removing the structure. *Stillwater* v. *Hudson Valley Railway,* 255 N. Y. 144, 151. *Detroit* v. *Detroit United Railway,* 172 Mich. 136, 158; affirmed *sub nomine Detroit United Railway* v. *Detroit,* 229 U. S. 39, 45–46. Indeed, the company makes no contrary contention as to the effect of a forfeiture. Furthermore, by such forfeiture the company loses any right that it derived from the grant of the location to maintain and operate such structure upon privately owned land in connection with its right to maintain and operate such structure in the public streets. What rights the company may retain after forfeiture in such privately owned land by reason of private ownership need not be determined in this case. The existence of any such rights does not preclude forfeiture of the entire location.

12. The forfeiture declared by St. 1939, c. 482, § 1, is therein stated as being not only on the ground of the Atlantic Avenue structure "no longer being operated in the public service for the purpose for which the franchise of the company to operate an elevated structure on the said location was granted" but also on the ground of its "constituting a nuisance in the public highway and unreasonably interfering with the enjoyment and use of said highway to the detriment of the public health and safety." Whether the latter ground is stated as an independent ground of forfeiture or a result of forfeiture on the former ground is not wholly clear. Since, however, the former ground, for reasons herein stated, is a sufficient ground of forfeiture, we need not consider

whether the latter ground would be sufficient as an independent ground. The principles applicable, however, have been stated to a considerable extent in the discussion of revocation of the location.

Fourth. 1. By the terms of St. 1939, c. 482, § 2, the issue to be determined upon the petition is "whether there is just cause for the revocation and declaration of forfeiture provided for in section one" of said act. Upon this issue we determine, for reasons herein stated, that, though there is not "just cause" for such a "revocation," there is "just cause" for such a "declaration of forfeiture" for failure to operate the Atlantic Avenue structure "in the public service for the purpose for which the franchise of the company to operate an elevated structure on the said location [described in said § 1] was granted." We determine that the Atlantic Avenue location is forfeited — as declared in said § 1 — for a material breach of the implied condition of the grant thereof that such location be used for the purpose for which it was granted.

2. Statute 1939, c. 482, § 2, confers no jurisdiction for the determination of any issue as to the propriety of the action that, by the terms of the statute, §§ 3, 4, is to follow a decision, such as is here made, sustaining the forfeiture. There is, however, nothing in the statutory provisions relating to such action that precludes enforcing the forfeiture declared by § 1 of the statute. The precise extent of the powers granted by these provisions relating to action following this decision is not before us for determination upon this petition.

Fifth. A decree is to be entered that the right of the company described in St. 1939, c. 482, § 1, is forfeited, as declared by said section, because the company's elevated structure therein referred to is "no longer being operated in the public service for the purpose for which the franchise of the company to operate an elevated structure" on the location described in said § 1 "was granted."

*Ordered accordingly.*